**Irene ZISBLATT, Appellant,**

v.

**Jack ZISBLATT, Appellee.**

**No. 2–84–110–CV.**

Court of Appeals of Texas, Fort Worth.

July 17, 1985.

Cribbs & McFarland, P.C., James A. Cribbs and Paul F. Wieneskie, Arlington, for appellant.

Hill, Heard, Oneal, Gilstrap & Goetz, Frank M. Gilstrap and Scott Curry, Arlington, for appellee.

Before FENDER, C.J., and ASHWORTH and JOE SPURLOCK, II, JJ.

## OPINION

JOE SPURLOCK, II, Justice.

This case is an appeal from the property division ordered in a divorce case. Appellee, Jack Zisblatt, petitioned for divorce from his wife, appellant, Irene Zisblatt. Irene cross-petitioned against Jack for divorce and filed a third party action against Dispo Sales and Service Corporation (hereinafter Dispo), a corporation owned by Jack at the time the parties were married. Irene's third party action against Dispo was on the theories of alter ego, transfers of community property to the corporation in fraud of Irene's rights, and for a reimbursement of the community for community labor and services provided to Dispo. Trial was to the court, which granted the petition for divorce but denied Irene's third party action against Dispo, and divided the property among the parties, holding there was no fraudulent transfer of community property, that Dispo was not the alter ego of Jack, and that the community was not entitled to any reimbursement from Dispo. The court filed findings of fact and conclusions of law. From the judgment dividing the community property, Irene has appealed.

We reverse and remand.

Jack and Irene Zisblatt were married in 1971. No children were born of the marriage. Jack filed a petition for divorce in November of 1981, and trial began on August 16, 1983, and continued into September of 1983. On January 30, 1984, the trial judge signed the decree of divorce. He signed findings of fact and conclusions of law on May 23, 1984.

Irene has raised fifteen points of error on appeal. Her points of error one through seven challenge the legal and factual sufficiency of the evidence to support the trial court's findings of fact and conclusions of law concerning the contractual relationship between Jack, Dispo and Lermer GmbH (hereinafter Lermer) and the trial court's disposition of Dispo's assets. Points of error eight through fourteen challenge the factual sufficiency of the evidence to support the trial court's findings of fact and conclusions of law which support the trial court's refusal to pierce the corporate veil of Dispo. Point of error fifteen, contained in appellant's second supplemental brief, challenges the legal and factual sufficiency of the evidence to support the trial court's findings concerning the abandonment of a 1979 contract between Lermer, Jack and Dispo.

Irene's entire appeal centers around the business relationship between Jack and Dispo and the contractual relationship between Jack, Dispo and Lermer. The majority of the trial involved testimony and documentary evidence concerning these business and contractual relationships. Irene attempted to show that the assets of Dispo

were in fact community assets because almost every asset normally associated with a community estate was claimed by Jack to be owned by Dispo.

Jack earns his living as a manufacturer's representative and during the marriage sold products manufactured by Lermer, Best Textile, Gamco, Gallo, AFC, Inter Mountain Design, American Business Group and B & H Container. These products are used primarily in the transportation industry, mostly by airlines and railroads. He also sold products used in the packaging industry and manufactured by Berles, V & F Foam, and Enterprise Corrugated.

At the time of trial, Jack had worked for Berles for about 30 years and he had been selling Berles products on a commission basis for over twenty years. He estimated that, at the time of his marriage, his income was 95% from Berles sales and only 5% from sales associated with Dispo. At the time of separation, Jack estimated that such division of income had balanced out to approximately 50% from each source.

All of the commission for sales of these various products were received by virtue of either written or oral contracts between the manufacturer and either Jack or Dispo. With the exception of those paid by Berles, all commissions paid directly to Jack were deposited into the account of Dispo regardless of the identity of the party to the contract. Dispo then paid a salary to Jack. As of June 30, 1983, the cash assets of Dispo amounted to $542,633.00.

The parties, after their marriage, lived in New Jersey in the home owned by Irene. In return for Jack's expenditure of $50,000.00 of his separate funds on Irene's home, she conveyed one-half of that property to him. They decided to move to Texas in 1979 to be near American Airlines' headquarters, since a major portion of Jack's sales were to that airline. In Arlington, the couple lived in a home which was purchased in Dispo's name at a cost of $242,780.00. The Zisblatts added 635 square feet to the Arlington home to accommodate Jack's office as well as a bathroom and another room for entertaining customers. Thereafter, Dispo made the mortgage payments and the Zisblatts paid rent to Dispo.

In 1980, the New Jersey home was sold for $98,000.00. The proceeds were used to purchase a certificate of deposit. In 1981 the Zisblatts, using the certificate as collateral, borrowed $48,000.00 and used these funds to make a loan to Dispo in the same amount, which funds were used to build another addition to the home in Arlington. When the $98,000.00 certificate matured, the $48,000.00 bank loan of the Zisblatts' was paid off and $52,000.00 of the remainder was invested in another certificate of deposit, which upon maturity and with the court's permission was divided equally between the parties. The $48,000.00 was never repaid to the Zisblatts by Dispo.

At trial, Dispo's certified public accountant, Richard Levine, testified that corporate funds from Dispo in the amount of $24,807.41 were used to purchase the furniture that went into the Arlington home. Jack testified that all of the furnishings in the Arlington home were paid for and owned by Dispo. He further testified that all of the furniture was in Irene's possession and that it had a value of "about $12,000.00".

The only automobile in the family was a 1979 Buick, however, Dispo leased two Lincoln Continentals, one of which Jack used when he was working from his home in Texas and the other was kept in the New Jersey area for his use in his frequent trips there. Levine's testimony indicates that Dispo paid all of the utilities at the Arlington home and for the home's maintenance as well. Dispo provided a medical program for employees and during their marriage Dispo paid $32,680.00 in medical expenses for Jack and Irene.

Jack and Irene literally owned nothing more than the clothes on their backs. It is obvious why Irene attempted to bring the assets of Dispo into the community estate. She alleged that Dispo's largest account, Lermer, was in fact a community asset and she attempted to get the court to pierce the corporate veil. These attempts were part

of her overall attempt to either have Dispo's assets declared to be community assets or to have the community estate reimbursed by Dispo for community time and effort expended in enhancing the value of Dispo. Irene specifically pled the community estate's right to reimbursement.

In the divorce decree, Irene was awarded her personal belongings, the 1979 Buick, the furniture in her possession, $25,000.00 to be paid by Dispo on the Zisblatts' loan of $48,000.00 for additions to the home, a townhouse (subject to indebtedness acquired by Irene on a lease purchase contract after Dispo sold the parties' home) $22,000.00 from an escrow account (of which $8,000.00 had already been paid to her), a note in the amount of $51,314.97 to be executed by Jack, and attorney's fees of $22,500.00 to be paid by Dispo. The award to Jack included his personal belongings, all Dispo stock and other interests in Dispo, Jack's Dispo employment benefits, all of Berles employment benefits, all of his insurance policies, all of the parties' interest in an investment of Compu-Med, Inc., and all interest of the parties in David Associates, a partnership.

The decree of divorce further set aside to Dispo all contracts arising from or in connection with it, together with all funds, accounts and rights received or to be received from such contracts. Dispo further retained all funds and notes payable from the sale of the Arlington home. In making this disposition of property to Dispo, the trial court specifically refers to the contract(s) with Lermer.

At trial and on appeal, the agreement, under which Jack sold Lermer products primarily to American Airlines and Pan American Airlines, was vigorously contended by Irene to be a community asset and equally vigorously contended to be a separate, corporate asset by Jack. The record bears out that the bulk of the more than half-million dollar cash asset of Dispo in 1983 had accumulated from the sale of Lermer products.

The first Lermer agreement dated December 19, 1979, is designated "Agreement between Jack Zisblatt and Lermer GmbH," and is signed by Jack, without reference to Dispo or his corporate office. On January 21, 1980, there was a two paragraph instrument titled "Agreement" between the same parties, containing a minor alteration of rate of commission on 1980 sales. On March 17, 1980, the same parties signed an "Addendum to Agreement between Jack Zisblatt and Lermer GmbH dated December 19, 1979." On September 21, 1980, the same parties signed an instrument reciting "This Addendum dated September 21, 1980, to the Agreement between Jack Zisblatt and Lermer GmbH dated December 19, 1979". None of these agreements mention Dispo and it is noteworthy that the September 21, 1980, instrument contains this recital: "In case of Jack Zisblatt's death Lermer GmbH['s] obligation on commission will be limited to orders placed prior to his death."

Jack testified that in August or September of 1981, a dispute arose over Lermer's insistence that Jack service the sales he made for three years against warranty claims. He testified that he consulted an attorney regarding a possible lawsuit and was advised that the Lermer contract should be assigned from Jack Zisblatt to Dispo. The assignment took place after a resolution of Dispo to accept the assignment which resolution is dated January 1, 1980. Jack admitted that the purported assignment was not even prepared until sometime in late 1981 and was then back dated to January of 1980. We note the petition for divorce was filed in November of 1981.

Thereafter, according to Jack, the original agreement was abandoned and a new, *verbal* agreement was negotiated between Lermer and Dispo, which was in effect at the time of trial. In summary, he claims that neither the agreement nor the commissions earned pursuant to the agreement were assets of the community because (1) he negotiated the original agreement as agent for Dispo, (2) the agreement was assigned by him to Dispo, (3) the original agreement was abandoned by both parties,

(4) his assignment to Dispo cannot constitute fraudulent disposition of a community asset because when it was assigned it had no value because of the abandonment and (5) the "new" verbal contract was clearly between Lermer and Dispo.

We deem it unnecessary to further analyze the Lermer agreement because our disposition of this appeal will be based upon our finding that Dispo is in fact the alter ego of Jack Zisblatt. We therefore find it unnecessary to consider Irene's points of error one through seven, however, her point of error four will be addressed as it applies to her other points of error.

Irene's points of error eight, nine, ten and eleven contend that the trial court's findings of fact nos. 12, 13, 20, and 22 are against the overwhelming weight and preponderance of the evidence in that Dispo is in fact the alter ego of Jack. Her points of error twelve and thirteen contend that the trial court's conclusion of law nos. 37 and 38 are against the overwhelming weight and preponderance of the evidence in that Dispo is in fact the alter ego of Jack. Point of error fourteen contends that the trial court erred as a matter of law and abused its discretion in setting aside all property and assets of Dispo to Jack and thereby failing to consider same in dividing the estate of the parties because the overwhelming weight and preponderance of the evidence showed that Dispo was the alter ego of Jack. In point of error four, Irene argues that the evidence is factually insufficient to support the trial court's finding of fact no. 25.

The above challenged findings of fact made and filed by the trial court are as follows:

\*    \*    \*    \*    \*    \*

12. The corporation, Dispo Sales & Service Corp., was not utilized during the marriage to defraud existing creditors of either said corporation or of the parties, nor was it used to defraud MS. ZISBLATT. Additionally, it was not utilized to circumvent any statute, evade an existing obligation of either said corpora-

tion or of the parties, or to protect crimes or perpetuate a monopoly, or to achieve an inequitable result.

13. MR. ZISBLATT did not utilize the corporate form of Dispo Sales & Service Corp., for an improper purpose as to MS. ZISBLATT and further, he did not use the corporate form to deprive her of any community property rights.

\*    \*    \*    \*    \*    \*

20. The corporate formalities were adhered to by Dispo Sales & Service Corp., in connection with conducting its business.

\*    \*    \*    \*    \*    \*

22. Dispo Sales & Service Corp., is not an alter ego of JACK ZISBLATT.

\*    \*    \*    \*    \*    \*

25. Regardless of the legal status of Dispo Sales & Service Corp., and the nature of the property acquired by it during the marriage of JACK ZISBLATT and IRENE ZISBLATT, the Court finds that, considering the circumstances of the parties, all of the stock and/or other interests in Dispo Sales & Service Corp., should be set aside to JACK ZISBLATT.

The challenged conclusions of law state:

37. All property acquired by Dispo Sales & Service Corp. during the marriage of the parties is not part of the community estate of the parties.

38. Dispo Sales & Service Corp., is not the alter ego of JACK ZISBLATT.

▆▆▆ Findings of fact entered in a case tried to the court are of the same force and dignity as a jury's verdict upon special issues. *City of Clute v. City of Lake Jackson,* 559 S.W.2d 391, 395 (Tex.Civ.App. —Houston [14th Dist.] 1977, writ ref'd n.r. e.). The trial court's findings of fact are reviewable for legal and factual sufficiency of the evidence to support them, *First National Bank in Dallas v. Kinabrew,* 589 S.W.2d 137, 146 (Tex.Civ.App.—Tyler 1979, writ ref'd n.r.e.), by the same standards as are applied in reviewing the legal or factual sufficiency of the evidence supporting a jury's answer to a special issue. *Okon v.*

*Levy,* 612 S.W.2d 938, 941 (Tex.Civ.App.—Dallas 1981, writ ref'd n.r.e.).

■ Where the factual sufficiency of the evidence to support a finding is challenged (an "insufficient evidence" point), we must consider all the evidence in support of and contrary to the challenged finding to determine if the finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *See In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661–62 (1951); *City of Lubbock v. South Plains Electric Cooperative, Inc.,* 593 S.W.2d 138, 143 (Tex.Civ. App.—Amarillo 1979, writ ref'd n.r.e.).

It has been stated many times by the Supreme Court of Texas that:

'Courts will not disregard the corporation fiction and hold individual officers, directors, or stockholders liable on the obligations of a corporation except where it appears that the individuals are using the corporate entity as a sham to perpetrate a fraud, to avoid personal liability, avoid the effect of a statute, or in a few other exceptional situations.'

*Torregrossa v. Szelc,* 603 S.W.2d 803, 804 (Tex.1980). *See Bell Oil & Gas Co. v. Allied Chemical Corp.,* 431 S.W.2d 336, 340 (Tex.1968); *Pace Corporation v. Jackson,* 155 Tex. 179, 284 S.W.2d 340, 351 (1955).

■ The burden of proof necessary to pierce the corporate veil may be satisfied and the corporate fiction may be disregarded:

(1) where it is used as a means for perpetrating fraud; (2) where the corporation is organized and operated as the mere tool or business conduit of another corporation; (3) where resort is made to the corporate fiction in order to avoid an existing legal obligation; (4) where the corporate form is used to achieve or perpetuate monopoly; (5) where the corporate structure is used as a vehicle for circumventing a statute; or (6) where the fiction is invoked in order to protect crime or justify wrong.

*Roylex, Inc. v. Langson Bros. Construction Co., Inc.,* 585 S.W.2d 768, 771 (Tex. Civ.App.—Houston [1st Dist.] 1979, writ ref'd n.r.e.). The court in *Roylex, Inc.,* further held that:

Those acts or misuses which may cause a court to "pierce the corporate veil" include the commencement of business without the issuance of shares, a lack of shareholder meetings or directors' meetings or of the signing of consents, the making of decisions by shareholders as if they were partners, failure to distinguish between corporate property and personal property, use of corporate funds to pay personal expenses without proper accounting, or failure to maintain complete corporate and financial records. There seems to be little reason to punish errant shareholders unless their actions are directed toward defrauding another party.

*Id.* at 772. The disregard of the corporate entity will of course depend on the particular facts of each case.

■ It has been held that domination of corporate affairs by a sole stockholder will not in itself justify imposition of personal liability. *Tigrett v. Pointer,* 580 S.W.2d 375, 381 (Tex.Civ.App.—Dallas 1978, writ ref'd n.r.e.). Neither will the mere unity of financial interest justify a disregard of the corporate entity. *See Hanson Southwest Corporation v. Dal-Mac Construction Company,* 554 S.W.2d 712, 716 (Tex.Civ.App.—Dallas 1977, writ ref'd n.r.e.). In addition to either one of these facts, it must be shown that the corporate form was used to perpetrate a fraud or is relied on to justify wrongs and cause injustice. *Tigrett,* 580 S.W.2d at 381. The corporate entity will not be disregarded unless:

1) it is made to appear that there is such a unity that the separateness of the corporation has ceased to exist; and 2) the facts are such that an adherence to the fiction of the separate existence of the particular corporation would, under the particular circumstances, sanction fraud or promote injustice.

*Mortgage and Trust, Inc. v. Bonner & Company, Inc.*, 572 S.W.2d 344, 349 (Tex. Civ.App.—Corpus Christi 1978, writ ref'd n.r.e.).

In *Dillingham v. Dillingham*, 434 S.W.2d 459 (Tex.Civ.App.—Fort Worth 1968, writ dism'd.), this court upheld the decision of the trial court in finding that the husband's wholly owned corporation, for the purposes of the divorce litigation, was indeed the husband's alter ego and that the increase in the value of the corporation was part of the community estate. In that case, facts of which were not detailed in our opinion, we cited with approval the rationale and conclusions contained in the exhaustive study reported in the Attorney General of Texas' Opinion # 0–6595 handed down on September 18, 1945. Op. Tex.Att'y Gen. No. 0–6595 (1945).

The Attorney General's Opinion concluded that inheritance tax will accrue on one-half of accumulated surplus of a corporation when all of such corporation's stock was owned prior to, during and after marriage by a surviving spouse who transacted personal business through the corporation. Having previously adopted the reasoning of the Attorney General we take the liberty of setting forth the following excerpts from his opinion:

While the recognition of a corporation as an entity separate and distinct from the members who compose it is fundamental, it is a legal fiction and is not a sacrosanct principal inevitably followed when the fiction is opposed to the facts. Practically, it is necessary to disregard the fiction in order to cope with some abuses of the corporate method of conducting business. The larger principles of justice must not be obscured by the corporate veil. A fiction should not prevail over fact.

The ownership of all of a corporation's stock by one man is not prohibited in Texas, but when a stockholder is the sole owner (or even practically the sole owner) and treats the corporation as his alter ego, the corporate entity should be disregarded if its use is repugnant to broader principles or provisions of law. In Merrill v Timmons, the court (Court of Civil Appeals, Galveston) said:

"... It is well settled in such instances that, to prevent injustice, our courts will look through the mere corporate form of things to the reality, and hold one who is in that manner and form merely carrying on transactions for and in behalf of himself personally; ..."

[In] In re Chas. K. Horton, Inc., the language of the court is particularly applicable here:

"It must be conceded that a corporation entity will not be ignored because one individual owns all of the stock. Courts exercise great caution in ignoring the artificial entity and such ignoring only comes if and when the proof substantiates the thought, and drives any conclusion from the mind, that the entity is in fact the tool or mere agency of the owner of the stock."

\*     \*     \*     \*     \*     \*

Among the circumstances when this will be done [disregarding the corporate fiction] are included those situations in which the use of the corporate fiction operates to circumvent a statute, prejudice the rights of third parties, or result in an evasion or [sic] existing legal obligation. The following is quoted from the case cited (55 S.W.[2d] 622) [sic] [*Continental Supply Co. v. Forest [Forrest] E. Gilmore Co. of Texas*, 55 S.W.2d 622 (Tex.Civ.App.—Amarillo 1932, writ dism'd)]:

"Upon ascertainment of the facts, the courts will disregard the fiction of corporate entity where the fiction (1) is used as a means of perpetrating fraud; (2) where a corporation is organized and operated as a mere tool or business conduit of another corporation; (3) where the corporate fiction is resorted to as a means of evading an existing legal obligation; (4) where the corporate fiction is employed to achieve or perpetrate monopoly; (5) where the corporate fiction is used to

circumvent a statute; and (6) where the corporate fiction is relied upon as a protection of crime or to justify wrong." [Citations omitted.]

*Id.*

These same rules surrounding the theory of alter ego and a piercing of the corporate veil have been applied to divorce actions by the courts of appeals. *See Vallone v. Vallone,* 618 S.W.2d 820, 824 (Tex. Civ.App.—Houston [1st Dist.] 1981), *rev'd.,* 644 S.W.2d 455 (Tex.1983); *Duke v. Duke,* 605 S.W.2d 408, 411 (Tex.Civ.App.—El Paso 1980, writ dism'd); *Humphrey v. Humphrey,* 593 S.W.2d 824, 826 (Tex.Civ. App.—Houston [14th Dist.] 1980, writ dism'd); and *Goetz v. Goetz,* 567 S.W.2d 892, 895 (Tex.Civ.App.—Dallas 1978, no writ). *See also Spruill v. Spruill,* 624 S.W.2d 694 (Tex.App.—El Paso 1981, writ dism'd) and *Bell v. Bell,* 504 S.W.2d 610 (Tex.Civ.App.—Beaumont 1974), *rev'd.,* 513 S.W.2d 20 (Tex.1974). The theory of alter ego is applied in order to achieve an equitable result. In an action for divorce, it is applied to properly characterize corporate assets as part of the community estate. The Supreme Court in *Vallone* indicates that the theory of alter ego is an equitable remedy separate and apart from the rule of reimbursement. *Vallone,* 644 S.W.2d at 459. *See id.* at 466, n. 9 (Sondock, J. dissenting).

In *Vallone,* one of the appellant wife's points of error was that the trial court's finding that the corporation was not her husband's alter ego was against the great weight and preponderance of the evidence. The Court of Appeals considered this point of error last, after having already sustained appellant's points of error complaining about the inequitable and manifestly unfair divisions of the estate. *Vallone,* 618 S.W.2d at 824. The Court of Appeals held that:

> Although many acts by appellee deviated from ideal management practices, there is no showing or indication that these acts were committed for the purpose of perpetrating a fraud on appellant or others or that in fact a fraud resulted

as a result of the acts. This point is overruled.

*Id.* In this respect, we emphasize that this holding came after the Court of Appeals had already determined that the division of property was manifestly unfair by stating:

> We are convinced that the court, in making a division of the estate, did not take into consideration the large increment to appellee's separate property by reason of community labor and as a result the division of the estate was manifestly unfair to appellant. This point of error is sustained.

*Id.*

The Supreme Court construed the lower court's holding in *Vallone* as granting the community estate a right to be reimbursed by the husband's separate estate. *Vallone,* 644 S.W.2d at 457. The Supreme court went on to hold that it did not have jurisdiction over any of the wife's challenges to the lower court's finding on alter ego. *Id.* at 458. It further held that the wife had waived any right to reimbursement by failing to specifically plead such a theory of recovery. *Id.* at 459.

While the majority opinion in *Vallone* is lacking in direction for lower courts on the issue of alter ego in divorce cases, Justice Sondock's dissenting opinion offers what we find to be sound judicial reasoning in this area. Justice Sondock states: "Basic principles and policies of community property support the proposition that the earnings of a spouse-owned business to which one or both spouses devote time, talent, and toil should be subject to division on divorce." *Id.* at 465. She cites with approval this Court's holding in *Dillingham,* and then states that:

> I would hold that in a divorce case where a non-owner spouse proves that a spouse's time, talent, and toil are primarily responsible for the increase in the value of a business operated as a corporation, *the increase in the value* is community property, even though a business or a part thereof is separate property. [Footnotes omitted.]

*Id.* at 466. In a footnote, Justice Sondock goes on to state that:

I feel compelled to suggest that this Court adopt a legal standard that does not revolve around a factual finding of fraud for divorce cases in which a business would be classified as a sole proprietorship but for the fact of incorporation. This is obviously one of the "exceptional situations" referred to in *Pace Corp. v. Jackson,* 155 Tex. 179, 284 S.W.2d 340 (1955).

*Id.* at 466, n. 9. We need not adopt the rule suggested by Justice Sondock in order to dispose of the present case as we find that the record in the present case is adequate to support a finding of fraud.

Dispo was incorporated in 1968 in the state of New Jersey. In order to comply with the laws of New Jersey, stock was originally issued to three persons; Jack, Levine and Levine's wife. This original stock issue consisted of 50 shares to Jack, 40 shares to Levine and 10 shares to Levine's wife. Both Jack and Levine testified that, upon issuance of these shares, Levine and his wife endorsed the shares in blank and immediately returned them to Jack. Levine explained the process in this manner:

At the time in New Jersey I believe that you needed three incorporators and I believe you needed three either directors or officers. That was State law. What was typically done at that time was that in the case of a very small corporation like Mr. Zisblatt's Dispo Sales, he came to an attorney's office and *he was the only one involved with that company.* However, either whoever was standing around the office at that point in time, usually it was the attorney's clerk or whoever came in with him, were given what they called nominee stock. It was stock made out to them or the attorney's secretary. It was usually signed in blank in the back on the back of those stock certificates. They were also named as incorporators and as officers. [Emphasis added.]

It is clear that this process was utilized merely for the purpose of satisfying the laws of New Jersey.

Upon cross-examination, Levine admitted that he and his wife may have owned the stock until 1976. He further testified, however, that he never believed that he owned stock in Dispo and that his sole purpose in allowing himself to be listed as a shareholder was "as an accommodation for a client", Jack.

The evidence indicates that immediately following Dispo's incorporation in 1968, Jack became the owner of 100% of the stock. He therefore owned all of Dispo's stock at the time of his marriage to Irene in 1971. In or about 1976, three other wholly owned corporations which belonged to Jack were merged into Dispo.

Jack testified that he gave his sister, Phyllis Mirchin, 40 shares of Dispo stock in 1976. He explained this transfer by stating that his parents had loaned him close to $80,000.00 over the years and that he owed his father about $45,000.00. Jack testified that the purpose of such stock transfer "was to satisfy the debt owed to my father." In her deposition, Mirchin testified that she did not pay for the stock and that "[h]e gave me Dispo stock because my father wanted him to." She further stated that she did not know how much money her parents had given to Jack.

Mirchin's deposition further reveals that she believed that she either owned 40 shares of stock or 40 percent of the stock in Dispo. She stated that: "I became a shareholder of Dispo—this is '83. Seven, eight years ago. '75, '76, '77. Someplace in that span of time." She did not know the value of the stock transferred to her or if it even had any value. Mirchin did not even know the amount of stock owned by her brother, Jack.

When asked if she knew how the internal operation of Dispo was run, she answered: "I have no idea." When asked if she had ever attended a stockholder's meeting, she stated: "Privately-held corporations usually don't have stockholder's meetings per se." Mirchin stated that she was an officer

in Dispo, but when asked what office she held she responded: "What office? I don't know whether we settled on Vice-President or Secretary-Treasurer. One of those." She did not know the name "Lermer" or even who Lermer was and she did not remember voting on the assignment of the Lermer contract.

Mirchin stated that she was a director in Dispo but she did not know how many directors Dispo had and she did not know how votes were counted. She in fact stated: "This is not a stock trade over the exchanges where you worry about votes. So these kinds of things were done informally."

Mirchin testified that she assumes that she did sign some papers through the years as a stockholder of Dispo. She stated: "When my brother brought the papers over I signed them." She did not, however, recall the nature of any of the papers which she signed. In light of the above, it is interesting to note that Mirchin holds a Master's degree in Business Administration and is a college professor teaching management and accounting courses.

Mirchin received no salary, commissions or any other form of compensation from Dispo. She did not contribute any money or time and effort to the operation of Dispo. Dispo has never declared or paid a dividend to any shareholder. Jack testified, however, that in 1980, he received a check from Lermer for $35,000.00 which he in turn signed over to his sister, Mirchin, so that she could go into the real estate business. Both Jack and Mirchin described this transaction as a loan, but it was never reduced to writing, no interest was charged and as of the time of trial, Mirchin had done nothing more than agree to repay the loan. Prior to the conclusion of this lengthy trial, Mirchin did in fact repay a part of the $35,000.00.

It is unclear exactly how many persons were paid a salary by Dispo. At one point, Jack testified that he and Evelyn Ury, a bookkeeper and secretary, were Dispo's only employees. Later testimony by Jack indicates that Dispo employed two other

parttime bookkeepers and paid Jack's nephew to call on and service accounts for Dispo in the New York area.

Jack testified that even after the 40 shares were transferred to Mirchin, he exercised control of the company. He testified that he never told Dispo's accountant, Levine, about the transfer of the shares. Levine testified that he was not informed of such transfer until sometime in 1982. Dispo's income tax returns through 1981, which were prepared by Levine, reflect that Jack owned 100% of the stock. The only other evidence which established these stock transactions was a stock transfer ledger appearing in the corporate book.

Jack testified that a stock transfer ledger was not contained in the corporate book until around August of 1981. He testified that at some point in about 1981, problems arose with the Lermer contract and other contracts. Between August and October of 1981, the corporate book was taken to an attorney in New Jersey in order to bring it up to date. Jack stated that he had consulted with the attorney to learn what recourse he might have in collecting on the Lermer agreement if it was no longer honored by Lermer. At that time, it was suggested that Dispo's corporate books be put in order.

At the time the corporate books were put in order in 1981, the purported assignment of the Lermer contract was prepared and then back dated to January of 1980. When Jack was asked if he was contemplating divorce in 1980, he responded:

I don't know, Mr. Groce. I sometimes wonder. We were having considerable amount of difficulty. I don't know when I just said in 1979, no, sir, I don't know. We were having difficulty for a number of years.

Jack further admitted that he had discussed the possibility of divorce with this New Jersey attorney in 1981, prior to filing for divorce. It is one thing for a close corporation to keep accurate books and records and quite another for it to have accurate books and records prepared in anticipation of litigation. This is so regard-

less of whether the anticipated litigation surrounds a contract or a suit for divorce.

With the exception of rent paid to Dispo by the Zisblatts, the evidence at trial conclusively shows that the only income earned by Dispo came from the commissions received by Jack. Jack testified that, with the exception of what he earned from Berles, all the commissions he earned were deposited into Dispo. This was so regardless of whether the named payee on the commission check was Jack Zisblatt or Dispo. Levine testified that the commissions would first be deposited into Dispo's regular checking account and then divided among other accounts afterwards. Other than the commissions earned by Jack and rent paid, Dispo had no other source of income. The house in Arlington, the furniture contained therein and an automobile were Dispo's only physical assets.

At trial, Jack called John Turner as an expert witness to testify as to the value of Dispo. It was established that Turner was an expert in evaluating small or closely-held corporations. On direct examination, Turner was asked if he had some understanding of what role Jack played in the carrying on of the day-to-day business of Dispo to which he responded: "My understanding is that he is the company." He further qualified this statement by continuing: "That he [Jack] is the salesman, he is the contract, he has nobody else to really work for him." Turner further explained that the personalized nature of this business was a factor taken into consideration in establishing the value of Dispo's stock, "[b]ecause you have just one individual. That one individual is the business. Because he has nobody else." Turner rendered an opinion that if Jack were to die or leave Dispo, then the company would only be worth the residue that was left. As stated above, the Lermer agreement specifically provides that in the event of Jack's death, Lermer's obligation on commissions would be limited to orders placed prior to his death.

█ Under the facts of the present case, we find that to uphold the fiction of Dispo as an entity separate from Jack Zisblatt would be a clear and material prejudice to the rights of Irene and the community estate and an evasion of an existing legal obligation of Jack to devote his time, talent and industry to the community. Such result would be repugnant to long established concepts of the nature of property acquired during marriage. It is unnecessary to hold that there is such a unity between Jack and Dispo that the separateness of the corporation has ceased to exist because the evidence conclusively shows that Dispo, from its inception, never had an existence separate and apart from that of Jack. Clearly an adherence to the corporate fiction, under the facts of the present case, would both sanction a fraud and promote injustice.

We find that the trial court's findings of fact nos. 12, 13, 20 and 22 as well as its conclusion of law no. 38 are clearly against the great weight and preponderance of the evidence presented at trial. Irene's points of error eight, nine, ten, eleven and thirteen are sustained.

The evidence conclusively shows that, insofar as the issues in this divorce action are concerned, Dispo is in fact the alter ego of Jack. This does not merely refer to Dispo's status as of the time of trial. Instead, the evidence overwhelmingly establishes that Dispo was the alter ego of Jack at the time the parties were married, at the time that stock was ostensibly transferred to Mirchin and through the time of the parties' divorce.

█ We hold that all of the assets which came into Dispo during the time of the parties' marriage were in fact part of the community estate and subject to division upon divorce. The only exception to this would be the assets which came into Dispo pursuant to the 1976 merger of Jack's other companies into Dispo. We further hold that the character of Dispo's assets as community property could and would not be either changed, altered or affected by the ownership or transfer of stock to third parties. *See Spruill,* 624 S.W.2d at 694.

We find that the trial court improperly characterized the assets of Dispo as not being community property. We therefore find that the trial court's conclusion of law no. 37 is against the great weight and preponderance of the evidence. Irene's point of error twelve is sustained.

■■■ Although we have sustained the above points of error, this court would not be justified in reversing the trial court's division of property absent a finding that the trial court abused its discretion in making such division. TEX.FAM.CODE ANN. sec. 3.63(a) (Vernon Supp.1985), provides that:

> (a) In a decree of divorce or annulment the court shall order a division of the estate of the parties in a manner that the court deems just and right, having due regard for the rights of each party and any children of the marriage.

In applying this section of the Texas Family Code it has consistently been held that:

> Section 3.63 of the Texas Family Code affords the trial court wide latitude and discretion in dividing the community estate of the parties upon dissolution of their marriage. In reviewing the actions of the trial court, the appellate court will presume that the trial court exercised its discretion properly. The trial court's discretion will not be disturbed on appeal unless a clear abuse has been shown. [Citations omitted.]

*Vallone,* 644 S.W.2d at 460. "In dividing community property, the trial court may consider all the circumstances of the parties, including the health, capacities, and abilities of the parties, disparity in earning powers and business experience, the nature and potential of the property itself, and probable future need for support." *Jensen v. Jensen,* 629 S.W.2d 222, 225 (Tex.App.— Tyler 1982), *aff'd,* 665 S.W.2d 107 (Tex. 1984). In the present case, it is not enough for Irene to show that the mischaracterization of Dispo's assets resulted in an unequal division of property, but it must further be shown that such division is so manifestly unjust that it constitutes a clear abuse of the trial court's discretion. Irene must show that the trial court would have made a different division if the property had been properly characterized. *Id.*

From the record before this court, we are able to determine the value of all of the property awarded to Irene, with the exception of her personal belongings. We do not find the value of personal belongings awarded to the parties as being significant to the disposition of this case. Irene was awarded her personal belongings, the 1979 Buick Regal and all of the furniture in her possession. Jack testified that the Buick had a value of $5,300.00 and that the furniture was worth $12,000.00. She was further awarded $25,000.00 in cash, to be paid by Dispo, and $22,000.00 in Jack's escrow account deposited with his counsel. Jack was also to execute a note payable to Irene in the amount of $51,314.97 payable in twenty equal installments over a ten year period. The court did not order that the note be secured. Irene was further awarded a townhouse, subject to the debt thereon, which she had bought subsequent to her separation from Jack. The trial court then ordered that Dispo pay Irene's attorney's fees in the amount of $22,500.00. The total value of the assets awarded to Irene, without regard to the present value of the note from Jack, is $115,614.97. It is significant, however, that considering this note, Irene only had $69,431.50 in assets available to her in the first year following the divorce.

The divorce decree set aside all other community property to Jack. This included all employment related benefits from Berles and Dispo, all insurance policies in Jack's name, all interests in Compu-Med, Inc., and all interests in David Associates. The trial court further set aside to Jack, all of the Dispo stock. The trial court then awarded to Dispo all monies in the registry of the court, the promissory note received from the sale of the Arlington home and all contracts arising from or in connection with Dispo including all funds received or to be received therefrom. It is clear from this divorce decree that all of Dispo's assets were left intact and that Jack was

awarded all of his stock in Dispo. Because Dispo was in fact Jack's alter ego, this award in effect, set aside all of Dispo's assets to Jack.

Dispo's balance sheet of June 30, 1983, reflects total assets of $561,805.67 of which $542,633.22 was cash. This balance sheet further reflects total stockholder's equity as being $383,224.51. Levine testified that total shareholder's equity as of June 30, 1983, was $388,976.51 and that if the loan to Mirchin were included as a Dispo asset then total shareholder's equity would be $417,932.51. Levine further testified that the total shareholder's equity of Jack's four corporations, three of which were merged into Dispo, the fourth, prior to marriage was $63,659.95. This would indicate a total increase in stockholder's equity over the time of marriage of $354,272.56. These figures take into consideration payments of about $196,000.00 made to the IRS on taxes for 1982 and 1983.

■ Turner, Jack's expert witness, testified that Dispo's stock had a fair market value of $6,000.00 in 1971 and of $42,000.00 as of the time of trial. He testified, however, that his valuation of the stock was based on figures as of February 28, 1983, and not on figures as of June 30, 1983. Turner testified that as of June 30, 1983, if Dispo were liquidated then $234,000.00 would be available for distribution to its stockholders. He further testified that the liquidated value of the corporation's assets and the net worth of the corporation had nothing to do with the fair market value of Dispo's stock. Regardless of the figures used, we find these stock valuations to be of little significance. Because Dispo is the alter ego of Jack, we hold that under the facts and circumstances of this case the division of property upon remand should be based on Dispo's assets and not on a valuation of the stock. Dispo's stock, for all practical purposes, has no fair market value.

As stated above, in June of 1983, Dispo had approximately $540,000.00 in cash assets and $400,000.00 in total stockholder's equity. Levine testified that in April and

May of 1983, Dispo's cash assets had increased dramatically due to the receipt of between $400,000.00 to $500,000.00 in commissions from Lermer. These amounts do not reflect additional commissions of approximately $127,000.00 which were still to be received from Lermer as testified to by Jack. Jack also testified that he expected Dispo to incur expenses of approximately $100,000.00 over the next year in servicing Dispo's contracts. He indicated that expenses could amount to about 50% of commission received.

■ As of the time of trial, Dispo had cash on hand of $540,000.00 and was anticipating the receipt of another $127,000.00 from Lermer. This would have put stockholder's equity well above $400,000.00. There is nothing in the record which further indicates the amount of commission earned by Jack in 1983 but not yet received. Dispo had already paid $196,000.00 in taxes for the years 1982 and 1983. The trial, in the present case, concluded in September of 1983 and the decree of divorce was signed on January 30, 1984. Under the circumstances, the decree of divorce amounts to an award to Jack of approximately $400,000.00 in cash available for his immediate use and consumption. We find such an award to be manifestly unjust under the facts of the present case.

Jack properly points out that the trial court's division of property need not be equal. *See Bell*, 513 S.W.2d at 22. He argues that the division of property is fair and just and places reliance on the trial court's finding of fact no. 25 which has been challenged by Irene's point of error four. Jack cites this court to numerous cases, most of which we find to be either inapplicable or factually distinguishable from the present case. He does, however, cite the case of *Bell*, 513 S.W.2d at 20, which we find worthy of review.

In *Bell*, the appellant wife, challenged the trial court's division of property as having not taken into consideration the assets of the corporations owned by her husband. *Bell*, 504 S.W.2d at 610. The trial court found that the corporations were not

the husband's alter ego and made a finding of fact almost identical to finding of fact no. 25 in the present case which stated:

That regardless of the legal status of such corporations and the nature of the property acquired by such corporations during the marriage of the parties, the Court finds that considering the circumstances of the parties all of the stock or other interest in such corporations should be and is set aside to Norman L. Bell.

*Id.* at 611. The Court of Civil Appeals reversed based upon its finding that the trial court did not take the two corporations into consideration in making its division. *Id.*

On writ of error, the Supreme Court reversed the holding by the Court of Civil Appeals. *Bell,* 513 S.W.2d at 21. The Supreme Court found that the trial court did in fact take into consideration the two corporations and awarded them to the husband. *Id.* at 22. The *Bell* case is factually distinguishable from the present case. In *Bell,* all of the husband's stock in the corporations was irrevocably pledged to secure the payment of a promissory note, both the husband and wife had received a salary from the corporation and the wife had a substantial separate estate. *Bell,* 504 S.W.2d at 612–13 (Keith, J., dissenting).

We also find that *Bell* is distinguishable in that it dealt with the unequal division of property without an attack on the mischaracterization of property such as we have before us. It does not appear that the finding on alter ego was challenged in *Bell.* We note Justice Keith's dissent where he states: "I would have no hesitancy or reluctance in applying the rule announced by the majority to a situation where there was any evidence of the use of the corporate device to thwart the community property rights of the wife." *Id.* at 615. (Footnotes omitted.)

██ We have before us the exact use of the corporate device which was absent in *Bell.* In the present case, we have a spouse who has attempted to change the character of earned income by forming a corporation and then depositing such income into the corporate accounts. Dispo was nothing more than a series of accounts into which were deposited the majority of the commissions earned by Jack over the course of the marriage. This is clearly a fraud on the rights of the community.

In light of all of the facts and circumstances of the present case, we believe that the trial court would have divided the property differently had it taken into consideration and properly characterized the assets of Dispo as community assets. *See Jensen,* 629 S.W.2d at 226. It is clear from the record and the trial court's findings of fact and conclusions of law, that the trial court did not take into consideration the assets of Dispo in making the property division. This mischaracterization of assets resulted in an award to Jack over four times as large as the award to Irene. Even further, the award to Jack consisted almost entirely of liquid cash assets while about half of the award to Irene consisted of an unsecured promissory note. We find that the trial court's division of property was a clear abuse of discretion. Irene's points of error four and fourteen are sustained.

Finally, we address the argument raised by Jack that Irene has failed to challenge the trial court's conclusion of law no. 35, and that the judgment may be affirmed on this basis alone. The trial court's conclusion of law no. 35 states:

35. The partition ordered by the Court is just and right, and due regard has been given to the rights of each party of the marriage.

In support of his argument, Jack relies on the Supreme Court's opinion in *Williams v. Williams,* 160 Tex. 99, 325 S.W.2d 682 (1952), where it was stated:

The trial court's conclusion that the division was fair, just and equitable is an independent conclusion and will support the judgment. It was not attacked by point of error in petitioner's brief in the Court of Civil Appeals. The judgment of the Court of Civil Appeals may rest on that conclusion.

*Id.* at 684.

Initially, we note that the Supreme Court in *Williams,* at the conclusion of its opin-

ion, dismissed the application for writ of error for want of jurisdiction. *Id.* Therefore, the Supreme Court's opinion in *Williams* is dictum. Further, we find that Williams is factually distinguishable from the present case. *See Williams v. Williams*, 319 S.W.2d 777 (Tex.Civ.App.— Amarillo 1958), *writ dism'd w.o.j.*, 325 S.W.2d at 682. We further note the language from the Supreme Court's opinion where it is stated:

> Even if the trial court and the Court of Civil Appeals erred in holding that the house and lot is [sic] community property, *there are other findings of fact made by the trial judge* relative to the inter sese dealings by the husband and wife with their property over a period of years *tending to support the conclusion that the division made is "fair, just and equitable."* [Emphasis added.]

*Williams*, 325 S.W.2d at 684. The findings of fact and conclusions of law which tend to support the trial court's conclusion of law no. 35, in the present case, have been disposed of by this court's sustaining of Irene's points of error four, eight, nine, ten, eleven, twelve, thirteen and fourteen. We find Jack's argument in this respect to be without merit.

Since neither party complains of the portion of the judgment dissolving the marriage, that portion of the judgment is affirmed. Insofar as the judgment determines the division of the property of the parties, it is reversed and that portion of the cause is remanded to the trial court for further proceedings. *See Jacobs v. Jacobs*, 687 S.W.2d 731 (Tex.1985).