TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

 

 

 

NO. 03-07-00635-CV

 

 

 

Gary
Beck; Law Insurance Agency f/k/a The G. Beck Company d/b/a The Beck Company;
The Beck Benefits Company; and John Mueller’s Barbecue, Inc., Appellants

 

v.

 

The
Law Offices of Edwin J. (Ted) Terry, Jr., P.C.; John Ott, as Representative of
the Estate of Edwin J. (Ted) Terry, Jr., deceased; James A. Vaught; and Karl E.
Hays, Appellees

 

 

 

FROM THE DISTRICT COURT OF TRAVIS
COUNTY, 53RD JUDICIAL DISTRICT

NO. D-1-GN-04-002126, HONORABLE STEPHEN YELENOSKY, JUDGE PRESIDING

 

 

                                                                   O
P I N I O N

 

                        Appellants,
Gary G. Beck; Law Insurance Agency f/k/a The G. Beck Company d/b/a The Beck
Company; The Beck Benefits Company; and John Mueller’s Barbecue, Inc., appeal a
district court judgment that they take nothing on claims against appellees, The
Law Offices of Edwin J. (Ted) Terry, Jr. P.C.; John Ott, as Representative of
the Estate of Edwin J. (Ted) Terry, Jr., Deceased; James A. Vaught; and Karl E.
Hays.  We will affirm the judgment.

 

BACKGROUND


                        This
appeal arises from a suit brought by a client against attorneys who had
represented him in a divorce.  After seventeen years of marriage, Ruth Ann Beck
filed for divorce against appellant, Gary G. Beck, in November 2000.  The sole
contested issue in the divorce 

 class=Section2>

concerned the
property division; there were no children of the marriage.  After initially
retaining a Dallas-area family law firm, Beck eventually hired the late Edwin
J. (Ted) Terry, an Austin-based family law attorney, in September or October
2001.  At the time, Terry practiced in a sole proprietorship known as The Law
Offices of Edwin J. (Ted) Terry.  Appellees James A. Vaught and Karl E. Hays
are family law attorneys who were then associates (employees) of Terry.  Terry,
Vaught, and Hays (collectively, the “Terry Defendants”) were board-certified in
family law by the Texas Board of Legal Specialization.[1] 
Beck and Terry executed a “Legal Services Contract” wherein they agreed that,
among other terms, Terry would be the attorney-in-charge of Beck’s case but
that Hays and Vaught might also perform work on the matter.

                        A
central issue in the divorce litigation concerned the characterization of
assets and stock of three Texas corporations that were wholly owned, directly
or indirectly, by Beck.  Beck was the sole shareholder in Beck Benefits
Company, which he had formed in 1987.  Beck Benefits Company, in turn, was the
sole shareholder in G. Beck Company, which he also had formed in 1987.  Beck
was president of both corporations, and through them he conducted a risk
management or insurance consulting business.  As Ms. Beck emphasized at trial,
Beck’s work included testifying as an expert witness in over one hundred court
cases.  Beck also traded or invested in real estate through the two
corporations.  At the time of the divorce, the entities held title to several
parcels of real property in Austin.  Beck had also formed John Mueller’s
Barbecue, Inc., which operated a restaurant and held real property and other
assets.  The value of the assets Beck held through the three corporations
greatly exceeded the value of assets that Mr. Beck, Ms. Beck, or both held in
their own names.

                        Beck
claimed that when he first consulted with Terry about the representation, Beck
expressed his desire to obtain a summary judgment that his stock in his
wholly-owned corporations was his separate property.  Because most of his
assets were held through the corporations, Beck perceived such a ruling would
lead Ms. Beck’s counsel to “fold her tent . . . because she would see that
there’s no big pile of money at the rainbow.”  The Terry Defendants, on Beck’s
behalf, subsequently filed a motion for summary judgment that his stock in Beck
Benefits Company and G. Beck Company should be characterized as his separate
property.  Although Beck had formed both of the corporations during the
marriage, Beck relied on a theory, originally devised by an expert hired by his
prior divorce counsel, that his ownership interests could be traced back to
separate property interests he had held in Beck Benefits Company’s corporate
predecessors.  Ms. Beck filed a response attacking Beck’s tracing theory, as
well as a cross-motion for summary judgment that Beck’s stock was instead
properly characterized as a community asset.  Ms. Beck further argued in her
response that the evidence presented a fact issue as to whether the corporate
forms should be disregarded under an alter-ego or corporate veil-piercing
theory.  See Castleberry v. Branscum, 721 S.W.2d 270, 271 (Tex. 1986); Zisblatt
v. Zisblatt, 693 S.W.2d 944, 953 (Tex. App.—Fort Worth 1985, writ dism’d). 
In support, Ms. Beck presented evidence that Mr. Beck had run approximately
$650,000 in personal expenses through the corporations since 1990, had
commingled personal and corporate assets, and had diverted community assets and
opportunities to the corporations.  The district court denied both motions.

                        A
mediation was scheduled for February 4, 2002.  A few days beforehand, Ms. Beck
filed an amended petition adding Beck Benefits Company and G. Beck Company as
defendants and asserting claims for alter ego, fraud on the community, and
reimbursement.  The mediation proceeded as scheduled.  Terry attended the
mediation with Beck, and was the sole attorney advising him there.  The parties
negotiated the property division into the evening hours and resumed the
following morning, with Hays joining Terry in assisting with the negotiations. 
The parties eventually reached a settlement that day.

                        Beck
agreed to a 57-43 percent division of the marital property.  Of significance to
this appeal, Beck and his counsel acquiesced in including his corporations’
stock and their assets in the property the parties negotiated to divide, in
effect conceding for purposes of settlement that both the corporations’ stock
and their assets were community property.  It was agreed that Ms. Beck would
receive certain bank account balances and other financial assets previously
held by the corporations.  Beck retained ownership of both the corporate stock
and the corporate-held real estate assets, as he had desired.  Because the
value of these assets caused Beck’s share of the property being divided to
exceed the agreed-upon forty-three percent, it was agreed that he would execute
an owelty note in Ms. Beck’s favor in the amount of the excess—approximately
$516,000—plus interest.  It was further agreed that Beck would cause his
corporations to consent to a lien on all of the real property they held to
secure the entire amount of the indebtedness.  The parties also agreed that
Beck would secure confirmations from the superior lienholders on the
corporate-held properties that the additional lien was not prohibited and would
not trigger an event of default.  To protect Ms. Beck’s interest in the event
Beck did not obtain the confirmations or consents, it was agreed that she would
hold the stock certificates until the additional lien was perfected.

                        The
parties memorialized their agreement in a “Mediated Settlement Agreement” under
section 6.602 of the family code.  See Tex. Fam. Code Ann. § 6.602 (West
2006).  The Mediated Settlement Agreement provided, “THIS AGREEMENT IS
NOT SUBJECT TO REVOCATION,” and that, “The parties and their
attorneys recognize that this provision means that either party is entitled to
judgment on this Mediated Settlement Agreement as a matter of law.” 
(Emphases in original).  See id.  § 6.602(b)(1) (“A mediated settlement
agreement is binding on the parties if the agreement: . . . provides, in a
prominently displayed statement that is in boldfaced type or capital letters or
underlined, that the agreement is not subject to revocation”).

Beck signed the
agreement in both his individual capacity and as president of G. Beck Company
and Beck Benefits Company.  See id. § 6.602(b)(2) (also requiring signature
of each party to the settlement agreement).  Terry signed the agreement as
“Attorney for Gary Gene Beck.”  See id. § 6.602(b)(3) (also requiring
signatures of attorneys for each party).

                        Later
that day, the parties proved up the divorce and Mediated Settlement Agreement
before the district court.  Beck testified that he understood the entire deal
memorialized in the Mediated Settlement Agreement, that he was compromising
claims he had previously made that his businesses and other entities were his separate
property,[2]
that he was obligating his corporations to perform acts to effectuate the
Mediated Settlement Agreement’s terms, that Ms. Beck was receiving certain
corporate-held financial assets that day, and that he could have gone to trial
and obtained either a better or worse outcome than that to which he had
agreed.  Following his examination, the district court further inquired of
Beck: 

 

 class=Section3>

 

If I pronounce this today, it is
effective today.  The decree will then be presented in accordance with this, but
you cannot go change any terms and conditions.  And anything that you’ve
submitted, then this will overrule.  You can’t change it just because you don’t
like it, or you get mad at each other.  So you still want me to go and enter
this, Mr. Beck?

 

 

 

 class=Section4>

Beck responded,
“I do.”  Based on the evidence, the district court rendered judgment granting
the divorce, approving the Mediated Settlement Agreement, and dividing the
property as the parties had agreed.

                        Finalizing
the divorce decree and ancillary documents proved to be a lengthy and
contentious process.  In the aftermath of the settlement, Beck testified that
he consulted with an accountant and, at her suggestion, a corporate and tax
lawyer, and determined that the settlement’s structure was “unworkable” due to
its impact on the corporations.  During the months that followed, Beck,
primarily with the assistance of Hays, attempted to raise a number of issues as
to both the form and substance of the divorce decree and the ancillary
documents.[3] 
Beck testified that— notwithstanding the language of the Mediated Settlement
Agreement, his testimony at the prove-up hearing, and his sophistication and
experience as an expert witness and insurance consultant—he “did not understand
the agreement at the time.  Certainly didn’t know it was irrevocable.”  In
April, Beck and Hays were sanctioned for failing to meet deadlines under the
Mediated Settlement Agreement for commenting on opposing counsel’s drafts of
the final divorce decree and ancillary documents.[4] 
The disputes were initially arbitrated, as the Mediated Settlement Agreement
had provided, but ultimately were resolved by the district court, which signed
the final divorce decree on May 17, 2002.[5] 
Thereafter, Beck admitted he “resisted and refused” signing the ancillary
documents.  (In fact, after the final divorce decree was signed, Beck caused
one of the properties subject to the lien to be sold.)  Ultimately, on June 15,
Beck reluctantly signed the ancillary document under threat of arrest after
opposing counsel filed a motion for emergency relief and for sanctions.

                        In
July 2004, Beck sued the law firm he had initially hired to represent him in
his divorce, as well as two of their lawyers, pleading causes of action for
professional negligence, breach of fiduciary duty, DTPA violations,[6]
and breach of contract.  These claims were later settled and are not at issue
in this appeal.  In August, Beck amended his petition to add causes of action
for professional negligence, breach of fiduciary duty, DTPA violations, and
breach of contract against the Terry Defendants and The Law Offices of Edwin J.
(Ted) Terry, Jr., P.C., an entity Terry had formed during the intervening years
(collectively, “appellees”).  Beck’s wholly-owned corporations also joined the
suit as plaintiffs and asserted the same causes of action against appellees. 
Appellants’ central complaint was that the Terry Defendants advised or
permitted Beck to include his corporations’ stock and their assets in the
property division under the Mediated Settlement Agreement, causing injury to
the corporations.

                        Both
in the district court and on appeal, appellants have attempted to rely
primarily upon factual allegations that Terry “suffered from alcoholism and
substance abuse while he was representing Gary Beck in the above-described
divorce action.”[7] 
Specifically, appellants alleged that “Terry’s alcohol and substance abuse
addictions caused or contributed to the Terry Defendants’ failure to exercise a
reasonabl[e] standard of care when providing legal services.”  They further
pled that “all of the Terry Defendants knew of Ted Terry’s alcohol and
substance abuse problems,” failed to disclose these problems to Beck, and that
this failure violated the Terry Defendants’ duties of ordinary care, fiduciary
duties, and the DTPA.

                        Also
of relevance to this appeal, appellants pled that the Terry Defendants failed
to advise Beck about or “disclose” a “conflict of interest” between Beck’s
personal interests and those of his corporations.  Appellants pled these
allegations as an additional basis for their negligence,
breach-of-fiduciary-duty, and DTPA claims.  Finally, Beck pled a
breach-of-contract claim predicated upon allegations that the Legal Services
Contract contained a binding, enforceable promise by the Terry Defendants not
to advise Beck to enter into a divorce settlement without first agreeing to the
language of the final divorce decree.  Beck pled that the Terry Defendants
“breached this promise and had [Beck] enter into a mediated settlement
agreement on February 5, 2002, which was a producing cause of Plaintiff’s
damages.”

                        Appellees
moved for traditional summary judgment on three grounds:  (1) the claims that
appellants pled for breach of fiduciary duty, DTPA violations, and breach of
contract were mere components of a “fractured” professional negligence claim;
(2) the Legal Services Contract provision made the basis for Beck’s
breach-of-contract claim was not an enforceable promise; and (3) appellants’
DTPA and professional negligence claims were barred by limitations.  Appellees
filed a response with evidence.  This evidence included summary-judgment proof
going to whether Terry, in fact, had “alcohol and substance abuse addictions”
during the period in which the Terry Defendants had represented Beck.  The district
court granted summary judgment as to the breach-of-fiduciary-duty, DTPA, and
breach-of-contract claims without stating the grounds.  It expressly denied
summary judgment as to the professional negligence claim.

                        The
case proceeded to jury trial on appellants’ professional negligence claim.[8] 
Appellants again attempted to interject the issue of alleged alcohol or drug
use by Terry into the proceeding.  They sought to introduce evidence they had
obtained in discovery since the summary-judgment ruling, including medical
records from an Arizona rehabilitation center, Sierra Tucson,

where Terry had
been treated for an alcohol problem in September and October 2002.  The
district court excluded this evidence in its entirety under rule of evidence
403.

                        The
district court granted a directed verdict as to appellants’ negligence claim
against Vaught, but submitted a jury issue as to whether the negligence of
Terry, Hays, the firm he originally hired in the divorce, or Beck had
proximately caused economic loss to the corporations.  Only one element of
damages was submitted:  “the amount, if any, that the Beck Benefits Company
paid to Ruth Ann Beck pursuant to the mediated settlement agreement that it
would not have paid but for the negligence you found in answer to [the
negligence question].”  The jury found “no” as to the negligence of each party
or responsible person, and did not reach the damages issue.  Based on the
verdict, the district court rendered final judgment that appellants take
nothing on their claims.

                        Appellants
timely filed a motion for new trial.  Appellants urged the district court to
revisit the summary-judgment ruling on the fracturing issue in light of the
evidence going to Terry’s “alcohol or substance abuse addictions” that
appellants had obtained in discovery since that ruling.  Following a hearing,
the district court overruled appellants’ motion for new trial.  This appeal
followed.

 

ANALYSIS


                        In
three issues, appellants contend that the district court erred in granting
summary judgment on their claims for breach of fiduciary duty, DTPA violations,
and breach of contract; by excluding evidence of Terry’s “alcoholism and
substance abuse” at trial; and by overruling their motion for new trial.

 

Summary
judgment 

                        In
their first issue, appellants contend that the district court erred in granting
summary judgment as to their claims for breach of fiduciary duty, DTPA
violations, and breach of contract.  We review the district court’s
summary-judgment ruling de novo.  Joe v. Two Thirty Nine J.V., 145
S.W.3d 150, 156-57 (Tex. 2004).  To prevail on their traditional motion for
summary judgment, appellees had the burden of proving “there is no genuine
issue as to any material fact and the moving party is entitled to judgment as a
matter of law on the issues expressly set out in the motion.”  Tex. R. Civ. P.
166a(c); Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d 546, 548 (Tex. 1985). 
If appellees met this burden, appellants would have the burden to present to
the district court any grounds that would preclude summary judgment.  City
of Houston v. Clear Creek Basin Auth., 589 S.W.2d 671, 678 (Tex. 1979). 
Summary judgment is appropriate only when there are no disputed issues of
material fact and the moving party is entitled to judgment as a matter of law. 
Nixon, 690 S.W.2d at 548.  In deciding whether a disputed fact issue
exists to preclude summary judgment, we treat evidence favorable to the
non-movant as true, and we must resolve every doubt and indulge all reasonable
inferences in the non-movant’s favor.  Id. at 548-49.  When, as here,
the district court’s order granting summary judgment does not specify the
ground or grounds relied on for the ruling, summary judgment will be affirmed
on appeal if any of the theories advanced are meritorious.  State Farm Fire
& Cas. Co. v. S.S., 858 S.W.2d 374, 380 (Tex. 1993).

                        Although
appellants challenge all three of the summary-judgment grounds appellees
presented in their motion, they devote most of their attention to the
non-fracturing ground.  Appellees join issue on appeal only with this ground
and the ground challenging the enforceability of the contractual provision on
which Beck’s breach-of-contract claim is based; they do not contend on appeal
that their limitations ground can support summary judgment as to the DTPA
claim.

                        Attorneys
owe their clients the duty to act with ordinary care—i.e., in a manner
consistent with the standard of care that would be expected to be exercised by
a reasonably prudent attorney.  See Cosgrove v. Grimes, 774 S.W.2d 662,
664 (Tex. 1989).  This “standard is an objective exercise of professional
judgment, not the subjective belief that [the attorney’s] acts are in good
faith.”  See id. at 664-65.[9] 
Complaints about an attorney’s care, skill, or diligence in representing a
client implicate this duty of ordinary care and sound in negligence.  See
id.  For example, “a lawyer can commit professional negligence by giving an
erroneous legal opinion or erroneous advice, by delaying or failing to handle a
matter entrusted to the lawyer’s care, or by not using a lawyer’s ordinary care
in preparing, managing, and prosecuting a case.”  Murphy v. Gruber, 241
S.W.3d 689, 693 (Tex. App.—Dallas 2007, pet. denied).  To prevail on a
professional-negligence claim against a lawyer, the plaintiff must prove (1)
the attorney owed this duty to the plaintiff; (2) the attorney breached that
duty; (3) the breach proximately caused the plaintiff’s injuries; and (4)
damages occurred.  Floyd v. Hefner, 556 F. Supp. 2d 617, 660 (S.D. Tex.
2008) (Texas law).

                        The
rule against “fracturing” professional negligence claims against attorneys
holds that “a case arising out of an attorney’s alleged bad legal advice or
improper representation” may not “be split out into separate claims for
negligence, breach of contract, or fraud [(or any other non-negligence theory)]
because the real issue remains one of whether the professional exercised that
degree of care, skill, and diligence that professionals of ordinary skill and
knowledge commonly possess and exercise.”  Kimleco Petroleum, Inc. v.
Morrison & Shelton, 91 S.W.3d 921, 924 (Tex. App.—Fort Worth 2002, pet.
denied) (citations omitted).[10] 
This Court has described some of the jurisprudential policies underlying the
non-fracturing rule:

 

 class=Section5>

 

Nothing is to be gained by
fracturing a cause of action arising out of bad legal advice or improper
representation into claims for negligence, breach of contract, fraud or some
other name.  If a lawyer’s error or mistake is actionable, it should give rise
to a cause of action for legal malpractice with one set of issues which inquire
if the conduct or omission occurred, if that conduct or omission was
malpractice and if so, subsequent issues on causation and damages.  Nothing is
to be gained in fracturing that cause of action into three or four different
claims and sets of special issues. . . . The ultimate issue is whether there
has been a breach of duty which causes damage.

 

 

 

 class=Section6>

Ersek v.
Davis & Davis, P.C., 69 S.W.3d 268, 274-75 (Tex. App.—Austin 2002, pet.
denied) (quoting Sledge v. Alsup, 759 S.W.2d 1, 2 (Tex. App.—El Paso
1988, no writ)).  The rule also serves 

 class=Section7>

to “prevent[]
legal-malpractice plaintiffs from opportunistically transforming a claim that
sounds only in negligence into other claims” to avail themselves of longer
limitations periods, less onerous proof requirements, or other tactical
advantages.  Deutsch v. Hoover, Bax & Slovacek, L.L.P., 97 S.W.3d
179, 189 (Tex. App.—Houston [14th Dist.] 2002, no pet.).

                        On
the other hand, “when cases say that clients cannot divide or fracture their
negligence claims against their attorneys into other claims, this does not mean
that clients can sue their attorneys only for negligence.”  Id.  Nor
does the non-fracturing rule necessarily bar a client from simultaneously
asserting professional negligence and non-negligence claims against an attorney
that are predicated on some common or overlapping facts.  Id. at 190; see
Tex. R. Civ. P. 48.  However, the claimant must do more than “merely
reassert the same claim for legal malpractice under an alternative label.”  Duerr
v. Brown, 262 S.W.3d 63, 70 (Tex. App.—Houston [14th Dist.] 2008, no
pet.).  “The plaintiff must present a claim that goes beyond what traditionally
has been characterized as legal malpractice.”  Id.; see also id.
at 74 (focusing on whether plaintiff had asserted “separate” non-negligence
claim “distinct from his legal malpractice”).

                        In
determining whether a complaint is a claim for negligence or something else,
“we are not bound by the labels the parties place on their claims.”  Murphy,
241 S.W.3d at 697.  “Regardless of the theory a plaintiff pleads, as long as
the crux of the complaint is that the plaintiff’s attorney did not provide
adequate legal representation, the claim is one for legal malpractice.”  Kimleco
Petroleum, Inc., 91 S.W.3d at 924.  This analysis focuses primarily on
ascertaining whether the facts that are the basis for an asserted cause of
action implicate only the lawyer’s duty of ordinary care or independently
actionable fiduciary, statutory, contractual, or other tort duties.  As the
Fourteenth Court of Appeals has summarized the analysis:

 class=Section8>

If the gist of a client’s
complaint is that the attorney did not exercise that degree of care, skill, or
diligence as attorneys of ordinary skill and knowledge commonly possess, then
that complaint should be pursued as a negligence claim, rather than some other
claim.  If, however, the client’s complaint is more appropriately classified as
another claim, for example, fraud, DTPA, breach of fiduciary duty, or breach of
contract, then the client can assert a claim other than negligence. 

 

 

 

 class=Section9>

Deutsch,
97 S.W.3d at 189-90 (citing Goffney v. Rabson, 56 S.W.3d 186, 190-94
(Tex. App.—Houston [14th Dist.] 2001, pet. denied)); see also Murphy,
241 S.W.3d at 697 (looking to “the real substance of the claims”).  This
inquiry may also be informed by the remedy the plaintiff seeks.  See id.
at 698.  The analysis is analogous to determining whether claims are based on
contract versus the DTPA or whether they sound in contract or tort.  Id.
at 189 (citing Crawford v. Ace Sign, Inc., 917 S.W.2d 12, 13-15 (Tex.
1996); Southwestern Bell Tel. Co. v. DeLanney, 809 S.W.2d 493, 493-95
(Tex. 1991)).  The determination of whether a complaint against a lawyer is
actionable in negligence versus some other legal theory is a question of law.  Duerr,
262 S.W.3d at 70; Murphy, 241 S.W.3d at 692.

                        In
support of the fracturing ground in their traditional summary-judgment motion,
appellees relied on the factual allegations in appellants’ live pleading at the
time, appellants’ second amended petition.  We accept each of these allegations
as true when reviewing the summary judgment.  See Perry v. S.N., 973
S.W.2d 301, 303 (Tex. 1998); American Nat’l Ins. Co. v. Int’l Bus. Mach.
Corp., 933 S.W.2d 685, 686 (Tex. App.—San Antonio 1996, writ denied).[11]

            Breach
of fiduciary duty

                        In
addition to the duty of ordinary care, an attorney owes fiduciary duties to his
client as a matter of law.  Willis v. Maverick, 760 S.W.2d 642, 645
(Tex. 1988).  The term “fiduciary” refers to integrity and fidelity; thus, “the
attorney-client relationship is one of the most abundant good faith, requiring
absolute perfect candor, openness and honesty, and the absence of any
concealment or deception.”  Goffney, 56 S.W.3d at 193 (internal
quotations omitted).  Attorneys must, among other things, “render a full and
fair disclosure of facts material to the client’s representation.”  Willis,
760 S.W.2d at 645.  To prevail on a breach-of-fiduciary-duty claim, a plaintiff
must prove (1) the existence of the fiduciary relationship; (2) a breach of
that duty by the attorney defendant; (3) that causes; and (4) damages to the
plaintiff.  Floyd, 556 F. Supp. 2d at 661.  However, if a client seeks
the remedy of equitable fee forfeiture and proves a breach of fiduciary duty by
the attorney, the client may obtain that remedy without need to prove causation
or damages if the court finds the attorney’s conduct was a “clear and serious
breach of duty” and that forfeiture of the fee (or some portion of it) is
“necessary to satisfy the public’s interest in protecting the attorney-client
relationship.”  Burrow v. Arce, 997 S.W.2d 229, 246 (Tex. 1998).

 

 class=Section10>

                        Not
every complaint that can be said to implicate a lawyer’s fiduciary duties is
actionable separately from a negligence claim.  Because a lawyer’s “standard of
care in negligence claims is often defined by the characteristics of that
inherent fiduciary relationship . . . courts refer to the fiduciary
relationship that the lawyer has to the client and use fiduciary standards to
define the standard of care required of lawyers.”  Murphy, 241 S.W.3d at
696.  Consequently, “courts have most often applied those standards to conclude
that the claims are really negligence, not breach-of-fiduciary-duty claims.”   Id. 
To distinguish independently actionable breach-of-fiduciary-duty claims against
lawyers from those that sound in negligence, Texas courts have generally held
that a breach-of-fiduciary-duty claim focuses on “whether an attorney obtained
an improper benefit from representing the client,” while a negligence claim
focuses on “whether an attorney represented a client with the requisite level
of skill.”  Id. at 693 (quoting Gibson v. Ellis, 126 S.W.3d 324,
330 (Tex. App.—Dallas 2004, no pet.)).  “Breach of fiduciary duty by an
attorney most often involves the attorney’s failure to disclose conflicts of
interest, failure to deliver funds belonging to the client, placing personal
interests over the client’s interests, improper use of client confidences,
taking advantage of the client’s trust, engaging in self-dealing, and making
misrepresentations.”  Gibson, 126 S.W.3d at 330.

                        In
their second amended petition, appellants pled the following “facts of claims
against Terry Defendants” as the basis for all of their asserted causes of
action:

 

 

 class=Section11>

38.       Defendants,
Edwin J. (Ted) Terry, Jr., James A. Vaught, and Karl E. Hays are attorneys
licensed to practice law in the State of Texas. Said Defendants were, at all
times relevant herein, members of the law firm, Defendant, [Law Offices of]
Edwin J. (Ted) Terry, Jr.  In the fall of 2001, Plaintiff, Gary Beck and Terry,
Jr., Vaught, Hays, and the Terry, Jr., Firm entered into an agreement for said
Defendants attorneys to provide legal services to Beck.

 class=Section12>

39.       The
Defendant, Terry, Jr. Firm and its attorneys were engaged by Beck to provide
legal services in connection with a divorce matter identified as Cause No.
FM0-07412; In the Matter of the Marriage of Ruth Ann Beck and Gary Gene Beck,
In the 345th Judicial District Court, Travis County, Texas.

 

40.       During
the course of that representation, Edwin J. (Ted) Terry, Jr., James A. Vaught,
and Karl E. Hays committed acts amounting to negligence in failing to be
prepared for hearings in court, failing to timely comply with court orders
resulting in the payment of attorneys’ fees to the attorney for Beck’s wife in
the divorce proceeding, failing to timely and appropriately respond to changes
in the divorce decree, pledging corporate and separate property as security for
notes given by Plaintiff, Gary Beck, failing to keep corporate property as
separate property, permitting corporate property to be combined with property
of the marital estate, failing to disclose a conflict of interest between Gary
Beck, individually and the corporate Plaintiffs named herein, and failing to
keep their client, the Plaintiff, properly and timely informed of matters
associated with his case thereby resulting in damages to Plaintiffs.

 

41.       The
Terry Defendants also assumed representation of the named corporate Plaintiffs
by giving Ruth Ann Beck a security interest in and to stock in the Plaintiff
corporations.  The Terry Defendants failed to disclose to Plaintiffs the
conflict of interest between Gary Beck and the Plaintiff companies named herein,
failed to advise Plaintiff Gary Beck to seek independent legal counsel.

 

42.       Upon
information and belief, Defendant Ted Terry suffered from alcoholism and
substance abuse while he was representing Gary Beck in the above-described
divorce action.  Defendant Ted Terry’s alcohol and substance abuse addictions
caused or contributed to the Terry Defendants’ failure to exercise a
reasonabl[e] standard of care when providing legal services to Gary Beck.  Upon
information and belief, all of the Terry Defendants knew of Ted Terry’s alcohol
and substance abuse problems, but failed to disclose such facts to Gary Beck. 
Had such facts been disclosed to Gary Beck, he would not have hired the Terry
Defendants to represent him.  

43.       The
Terry Defendants’ acts and omissions were a proximate and/or producing cause of
the damages suffered by Plaintiffs herein.

 

 

 

 class=Section13>

Appellees did
not attempt to negate appellants’ factual allegations in their summary-judgment
motion.  Consequently, we must take them as true for purposes of our review.  See
Perry, 973 S.W.2d at 303; American Nat’l Ins. Co., 933 S.W.2d at
686.

 class=Section14>

                        Appellants
incorporated these factual allegations and pled the following “breach of
fiduciary duty” cause of action:

 

 

 class=Section15>

A relationship of trust and
confidence existed between Plaintiff[s] and the Terry Defendants.  Defendants
breached their duty to act with utmost fairness and in good faith in the
representation of Plaintiff[s] in [the] divorce action.  Defendants breached
[their] duty to Plaintiff[s] to represent Plaintiff[s] with undivided loyalty
and to inform Plaintiff[s] of all material facts as soon as they arose.  In
addition, Defendants failed to make a full and fair disclosure of all material
aspects of the case to Plaintiff[s].  Specifically, Defendants failed to notify
Plaintiff[s] of important discovery deadlines which resulted in discovery
sanctions by the court as well as an unreceptive attitude toward Plaintiff[s]
by the court.  Defendants also failed to adequately prepare Plaintiff[s] for
court proceedings in that he was not fully informed of material aspects of the
case.  Said breaches of the fiduciary duty Defendants owed Plaintiff[s] were a
proximate cause of Plaintiff[s]’[] damages.[12]

 

 

 

 class=Section16>

Appellants have
contended they have asserted two factual theories that are properly classified
as independent claims for breach of fiduciary duty:  (1) the Terry Defendants
failed to disclose that Terry “suffered from alcohol and substance abuse”
during the representation; and (2) the Terry Defendants “failed to disclose to
Plaintiffs the conflict of interest” between Beck and his corporations and
“failed to advise Plaintiff Gary Beck to seek independent legal counsel.”  We
note that appellants did not refer to either of these factual theories when
pleading their breach-of-fiduciary-duty cause of action, instead
“[s]pecifically” referring to the Terry Defendants’ alleged failures to notify
them of “important discovery deadlines” or “to adequately prepare” Beck for
trial.  Nonetheless, because appellants also incorporated their “facts of
claims against Terry Defendants” when pleading this cause of action, those
factual allegations are a basis for appellants’ allegations that the Terry
Defendants “breached their duty to act with utmost fairness and in good faith
in the representation,” breached the duty of “undivided loyalty and to inform
Plaintiff[s] of all material facts as soon as they arose,” and “failed to make
a full and fair disclosure of all material aspects of the case to
Plaintiff[s].”

 

                        Alcohol
or substance abuse

                        Appellants
contend their allegations that the Terry Defendants failed to disclose Terry’s
“alcohol and substance abuse addictions” implicates a fiduciary duty that is
actionable independently from the duty of ordinary care.  Appellants represent
that there is no case from any jurisdiction that has addressed whether these
sorts of allegations can implicate an independently actionable fiduciary duty,
and we are aware of none.  However, appellants’ theory is inconsistent with the
reasoning of the Texas cases applying the non-fracturing rule.

                        Texas
courts, including this Court, have recognized that a complaint that a lawyer
“misrepresented” his competence to provide legal services or “failed to
disclose” his incompetence implicates only the lawyer’s duty of ordinary care
and is not independently actionable as a fiduciary duty, DTPA, or other tort
claim.  See, e.g., Ersek, 69 S.W.3d at 270, 274-75 (DTPA claim
based on law firm’s “misrepresentations regarding its competency to adequately
represent Ersek in the underlying medical malpractice action” constituted an
improperly fractured negligence claim); Greathouse v. McConnell, 982
S.W.2d 165, 172 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (complaint
that lawyer misrepresented legal services would be of competent quality when
they were not constituted a negligence claim and not a claim for breach of
fiduciary duty, DTPA violations, fraud, or breach of duty of good faith and
fair dealing); see also Aiken v. Hancock, 115 S.W.3d 26, 28-29 (Tex.
App.—San Antonio 2003, pet. denied) (“breach-of-fiduciary-duty” claim
predicated on “misrepresentation” and “failure to disclose” that lawyer and
expert witness were unprepared for trial sounded in negligence).  This is
because the complaint ultimately goes to the adequacy of the lawyer’s legal
representation.  See Deutsch, 97 S.W.3d at 189-90 (“If the gist
of a client’s complaint is that the attorney did not exercise that degree of
care, skill, or diligence as attorneys of ordinary skill and knowledge commonly
possess, then that complaint should be pursued as a negligence claim, rather
than some other claim.”).

                        Appellants’
complaint that the Terry Defendants failed to disclose Terry’s “alcohol and
substance abuse addictions” concerns a type of antecedent act or condition that
potentially impacts a lawyer’s competence or capacity to provide legal
services.  Appellants acknowledged this relationship in their pleadings,
alleging that “Defendant Ted Terry’s alcohol and substance abuse addictions
caused or contributed to the Terry Defendants’ failure to exercise a
reasonabl[e] standard of care when providing legal services to Gary Beck.” 
Similarly, in their appellate briefs, appellants describe  their allegations
relating to alcohol and substance abuse:  “In short, Plaintiffs alleged that if
Defendants had not breached their various obligations and duties to Mr. Beck
and advised him of Mr. Terry’s substance abuse problems, Mr. Beck would have
retained unimpaired counsel, been properly advised, and not suffered damages.” 
The gist of appellants’ complaint, in other words, is that because of Terry’s
alleged alcohol or substance abuse, appellants did not receive legal services
of satisfactory care, skill, and diligence.  This is a negligence claim as a
matter of law.  See id.

 

                        Although
appellants emphasize the sensational nature of their allegations about alcohol
or drug use, their complaint is analogous to an assertion that a lawyer was
afflicted by any of the myriad, more innocuous physiological factors that might
adversely impact a lawyer’s practice performance on a given day—e.g., illness,
sleep deprivation, emotions, or simply a lack of innate intelligence or
ability—or, for that matter, by such non-physiological practice impediments as
a malfunctioning office printer or absent secretary.  A complaint that a lawyer
“failed to disclose” such a condition or situation, like the complaints in Ersek
and Greathouse, would go to the lawyer’s competence or ability and,
ultimately, to the quality of legal services the lawyer provided.  An independent
“breach-of-fiduciary-duty” claim for “failure to disclose” Terry’s “alcohol and
substance abuse addictions” or any other antecedent condition bearing on the
Terry Defendants’ competence would merely fracture a professional negligence
claim, permitting separate submissions (and liability) regarding whether the
Terry Defendants breached the standard of care and the reasons why they
breached it.  See Ersek, 69 S.W.3d at 274-75 (quoting Sledge, 759
S.W.2d at 2) (explaining rationales of non-fracturing rule).

                        Also
instructive is Kahlig v. Boyd, 980 S.W.2d 685 (Tex. App.—San Antonio
1998, pet. denied).  In Kahlig, a former client sued the lawyer who had
represented him in a child-custody dispute with his first wife that had yielded
an adverse result for the client.  The client asserted causes of action for
fraud and DTPA violations based in part on allegations that the lawyer
surreptitiously had an affair with the client’s second wife during the
representation.  Id. at 687.  One of the client’s factual theories was
that the affair created a “conflict of interest” that diminished the lawyer’s
performance and rendered false previous representations by the lawyer that he
would handle the 

 class=Section17>

case to the
“best of [his] ability” and “be the best that [he] could be.”  Id. at
688-89, 690.  The court of appeals held that, however reprehensible the
lawyer’s conduct might have been, his failure to disclose the affair was not
independently actionable as a breach-of-fiduciary-duty or DTPA claim under this
theory because it ultimately was a complaint with the quality of the lawyer’s
representation and “fall[s] within the ambit of a claim for malpractice.”  See
id.  Terry’s undisclosed “alcohol and substance abuse addictions” is
analogous to the undisclosed affair in Kahlig—it is an antecedent act or
condition that is alleged to have impacted the care, skill, and diligence with
which a lawyer represents his client.  In the same way, appellants’ complaint
that the Terry Defendants failed to disclose Terry’s condition “fall[s] within
the ambit of a claim for malpractice.”  See id.

                        During
oral argument, appellants elaborated on their notion of the independently
actionable fiduciary duty they believe to be implicated by their allegations
about Terry’s undisclosed “alcohol and substance abuse addictions.”  They
insisted that even if a lawyer’s alcohol or substance abuse or addition has no
impact on the quality of legal services the lawyer provides, a client can
nonetheless sue for breach of fiduciary duty based on non-disclosure of the
condition, and at least obtain the remedy of equitable fee forfeiture, if the
client would not have initiated or continued the representation if he or she
had known of the condition.  Even if the condition ultimately did not affect
the legal services the lawyer provided, the complaint would nonetheless go to
the lawyer’s competence and, therefore, sound in negligence.  See Ersek,
69 S.W.3d at 270, 274-75; Greathouse, 982 S.W.2d at 172.  Appellants’
theory amounts to an end-run around the breach and causation elements of a
professional-negligence claim, permitting recovery based on the mere existence
of an antecedent condition that potentially could have contributed to a breach
of the standard of care by a lawyer, but did not.

 class=Section18>

                        In
their attempt to recast their negligence claim as breach-of-fiduciary-duty
claim, appellants ultimately rely on the fact that the Terry Defendants, like
most lawyers, charged fees for their services.  Specifically, appellants
maintain that because the Terry Defendants presumably stood to receive
attorney’s fees as long as their representation of Beck continued, and because
appellants alleged that Beck would not have hired the Terry Defendants had he
known of Terry’s “alcohol and substance abuse addictions,” they have asserted a
complaint that the Terry Defendants, when failing to disclose Terry’s
condition, were committing the sort of subordination of their client’s
interests to their own that distinguishes a breach-of-fiduciary-duty claim.  We
disagree that the mere fact the Terry Defendants might have had an expectation
of fees from continuing to represent Beck—a factor present in virtually every
attorney-client relationship—can convert appellants’ negligence claim into
breach-of-fiduciary-duty claim.

                        First,
an expectation of fees from continuing the representation, without more, would
not support the inference that the Terry Defendants’ failure to disclose
Terry’s “alcohol and substance abuse addictions” was motivated by an intent to
obtain those fees.  The non-disclosure is equally consistent with a more
general aversion to revealing these sorts of discomforting private facts to
others.  See Kahlig, 980 S.W.2d at 689-90 (mere fact that lawyer
continued to receive fees from representing client did not support inference
that lawyer’s failure to disclose affair with client’s wife was calculated to
obtain an improper benefit because the facts were equally consistent with
lawyer’s desire to surreptitiously continue the affair).  More importantly,
whether the Terry Defendants received attorney’s fees or an improper benefit is
not the focus of appellants’ complaint regarding undisclosed alcohol or
substance abuse.  Appellants did not allege that the Terry Defendants’ failure
to disclose Terry’s “alcohol and substance abuse addictions” had anything to do
with the pursuit of attorney’s fees or an improper benefit.  See Murphy,
241 S.W.3d at 699 (complaint that lawyer “engaged in self-dealing when they
continued to represent both Renick and the Brock[s]” sounded in negligence and
not fiduciary duty when “the Brocks do not allege the Lawyers deceived them,
pursued their own pecuniary interests over the Brocks’ interests, or obtained
any improper benefit by continuing to represent both clients”).  Instead,
appellants’ focus is that “Defendant Ted Terry’s alcohol and substance abuse
addictions caused or contributed to the Terry Defendants’ failure to exercise a
reasonabl[e] standard of care when providing legal services to Gary Beck.”  See
Duerr, 262 S.W.3d at 73-74 (despite allegations that firm received
additional fees from persuading client to settle, crux of complaint was that
client did not receive desired settlement amount due to mishandling of claim). 
Even if the Terry Defendants stood to receive attorney’s fees from continuing
the representation, the gist of appellants’ complaint was that the Terry
Defendants were unable to provide and/or did not provide adequate legal
services because of Terry’s condition.  Such a claim sounds in negligence, not
breach of fiduciary duty.  See id.; Murphy, 241 S.W.3d at
699; Ersek, 69 S.W.3d at 270, 274-75; Greathouse, 982 S.W.2d at
172.

                        We
hold that appellees met their summary-judgment burden to establishing their
entitlement to judgment as a matter of law that appellants’ complaint regarding
Terry’s undisclosed “alcohol and substance abuse addictions” sound solely in
negligence.[13] 
We also conclude that 

 class=Section19>

appellants did
not raise a fact issue to defeat appellees’ entitlement to summary judgment on
this issue.  In response to appellees’ motion, appellants presented
summary-judgment evidence—chiefly, deposition testimony from Terry’s ex-wife,
Kim Terry—going to whether Terry, in fact, had a problem with alcohol or drug
use during the period in which he had represented Beck.[14] 
Appellants also presented an affidavit from Beck in which he averred that the
Terry Defendants never disclosed to him that Terry had an alcohol or
substance-abuse problem, and that Beck would have fired the firm had he known
of the problem.  Appellees do not quarrel that this evidence raises a fact
issue as to the existence of an undisclosed alcohol and substance-abuse problem
that would have led Beck to terminate the representation—facts that we are
required to presume for summary-judgment purposes anyway—but urge that it adds
nothing to the legal analysis of whether appellants’ complaint about the
problem sounds in negligence or breach of fiduciary duty.[15] 
We agree with appellees.

                        As
we have explained, appellants’ complaint that the Terry Defendants failed to
disclose Terry’s “alcohol and substance abuse addictions” is a negligence claim
as a matter of law because it goes to the adequacy of the Terry Defendants’
representation.  This legal conclusion does not depend on the quantum of proof
appellants presented that Terry actually had “alcohol and substance abuse
addictions,” the extent of that problem, or that his colleagues might have
known about it while Beck did not.  With or without appellants’
summary-judgment evidence, it remains that their complaint implicates only the
Terry Defendants’ duty of ordinary care and not an independently actionable
fiduciary duty.  Consequently, appellants did not defeat appellees’ entitlement
to summary judgment as to this breach-of-fiduciary-duty theory.

 

 

                        “Conflict
of interest”

                        Appellants
additionally contend their allegations that “[t]he Terry Defendants failed to
disclose to Plaintiffs the conflict of interest between Gary Beck and the
Plaintiff companies named herein [and] failed to advise Plaintiff Gary Beck to
seek independent legal counsel” implicates a fiduciary duty that is actionable
independently from the duty of ordinary care.  As noted, an “attorney’s failure
to disclose conflicts of interest” is one of the circumstances that may give
rise to an independent breach-of-fiduciary-duty claim.  Gibson, 126
S.W.3d at 330.  However, “characterizing conduct as a . . . ‘conflict of
interest’ does not alone transform what is really a professional negligence
claim into . . . a breach-of-fiduciary-duty claim.”  Murphy, 241 S.W.3d
at 698.  Regardless of how the plaintiff may attempt to label his claims, if
the gist of the plaintiff’s complaint is that the lawyer failed to advise,
inform, or communicate with a client, it is a negligence claim.  Id. 
If, on the other hand, the gist of the complaint is that the lawyer obtained an
improper benefit by not disclosing the asserted “conflict,” it is an
independent breach-of-fiduciary-duty claim.  Id. at 693 (quoting Gibson,
126 S.W.3d at 330).

                        Examples
of the latter include complaints that lawyers failed to disclose a direct
pecuniary interest in the litigation that was adverse to the client and pursued
such an interest to the client’s detriment.  See Archer v. Medical
Protective Co., 197 S.W.3d 422, 427-28 (Tex. App.—Amarillo 2006, pet.
denied) (allegation that insurance-defense lawyer failed to represent client’s
interests in order to serve counsel’s “own interests in keeping the business
and favor” of the carrier “concerns a matter of divided loyalties, e.g., the
pursuit of his own pecuniary interests over the interests of his client . . .
[and] can be viewed as claims involving breached fiduciary duties”); Deutsch,
97 S.W.3d at 187, 190 (allegations that law firm failed to advise client about
conflicts presented when law firm was named as party in related proceeding,
failed to withdraw, and failed to recommend separate counsel “are appropriately
classified as a breach-of-fiduciary-duty claim, independent of Deutsch’s
negligence claim”); Spera v. Fleming, Hovenkamp & Grayson, P.C., 25
S.W.3d 422, 427-28 (Tex. App.—Houston [14th Dist.] 2000, no pet.) (lawyers’
failure to disclose to clients that they had competing claims to attorney’s fee
award).

                        The
requisite focus on improper benefit was also found in Floyd, a case that
appellants emphasize on appeal.  556 F. Supp. 2d at 662.  That case arose from
the bankruptcy of Seven Seas, an oil and gas company, following a risky and
unsuccessful exploration project that had been financed through a series of
transactions in which the participants had received mortgages on the company’s
assets and warrants on the company’s stock to the detriment of other
creditors.  Three of the Seven Seas directors participated directly or
indirectly in the financing transactions.  One of these directors, Fuller, was
a partner in the law firm of McAfee & Taft, P.C. (M&T), which also
served as Seven Seas’s outside counsel.  During the same period in which
M&T had been extensively involved in advising Seven Seas regarding the
financing, it also represented at least two other directors and the largest
participant in the financing on unrelated matters.  See id. at 623-28,
630-31.  The debtor and its trustee subsequently sued M&T and Fuller
complaining that the lawyers had breached their fiduciary duties by (1) failing
to fully inform Seven Seas of numerous conflicts of interest, (2) by providing
legal representation and advice while these conflicts existed, (3) by failing
to withdraw from representing Seven Seas when certain conflicts likely would
have or did impair their judgment, and (4) by putting the interests of M&T
and Fuller ahead of those of the company when they “chose not to . . . hire an
independent counsel to provide the legal opinion for the closing,” among other
omissions.  See id. at 662.  Although acknowledging that “[t]he fact that
a ‘conflict of interest’ is alleged does not necessarily give rise to a
separate cause of action for a breach of fiduciary duty,” the court held that
the first three complaints sounded in breach of fiduciary duty because their
“‘gist’ . . . is that the Lawyers obtained an improper benefit from their dual
roles, which speaks to a breach of fiduciary duty claim.”  Id.

                        On
the other hand, the Floyd court also held the allegations that the
lawyers put M&T and Fuller’s interests ahead of Seven Seas’s by failing to
hire an independent counsel (instead of the firm) to provide the legal opinion
for closing “complain about the adequacy of the representation rather than an
improper benefit accruing to the Lawyers [and] . . . relate solely to Seven
Seas’ negligence claim.”  Id.  Other Texas courts have similarly held
that “conflict-of-interest” complaints sound in negligence when their real
focus is the quality of the lawyer’s legal services and not whether the lawyer
pursued self-interest or improper benefit at the client’s expense.  See
Duerr, 262 S.W.3d at 73-74; Murphy, 241 S.W.3d at 698-99.  In Murphy,
the Brocks, heirs to limited partner in an entity that owned several
Blockbuster Video franchises, joined in a lawsuit brought by a fellow limited
partner, Renick, against the franchisor, Blockbuster Entertainment Corp.  As
the case progressed, the defendants filed a counterclaim against Renick. 
Ultimately, counsel for the Brocks and Renick negotiated a $7.5 million
settlement of the suit, and a final judgment was rendered based on the
settlement agreement.  The Brocks subsequently sued the lawyers, pleading
causes of action for breach of fiduciary duty and fraud.  The lawyers
successfully moved for summary judgment on grounds that the Brocks had asserted
a single “fractured” claim for professional negligence that was barred by
limitations.  Murphy, 241 S.W.3d at 691-92.  The Dallas Court of Appeals
affirmed.  With regard to breach of fiduciary duty, it considered the following
allegations:

 

 

 class=Section20>

(1) the Lawyers “continu[ed] to
represent Renick and the Brock[s] after Renick was sued by way of counterclaim
without getting a written waiver of the conflict of interest” from the Brocks;

 

(2) the Lawyers “represent[ed] to
the Brock[s] that their claims were not worth pursuing at trial should Renick
settle out despite the fact that [the Lawyers] knew that the [Brocks] had
viable and valuable claims independent of the claims or cooperation of Renick”;

 

(3) the Lawyers “urg[ed] the
[Brocks] to accept the $ 7.5 million aggregate settlement offer (which [the
Brocks] did, relying upon the [Lawyers’] expertise and duties of loyalty to
them, and the purported truthfulness of the [Lawyers’] representations)”;

 

(4) the Lawyers “engag[ed] in
self-dealing when they continued to represent both Renick and the Brock[s]
after Renick was sued by way of a counterclaim and no longer wanted to pursue
the matter to trial”;

 

(5) the Lawyers “agree[d] to set
aside the findings of the court in the Howell case, after advising [the Brocks]
that the Howell case had decided most of the issues leaving ‘very little to do
to prove damages’ and charging [the Brocks] exorbitant hourly fees for
reestablishing and proving the issues set aside”;

 

(6) the Lawyers “divid[ed] the
aggregate settlement, half to Renick and half to [the Brocks], despite the fact
that Renick had been sued by way of counterclaim and knowledge that Renick’s
cause of action was probably barred by limitations while [the Brocks’] claims
were not”;

 

(7) the Lawyers “chos[e] their
own interest in obtaining a multimillion dollar fee in the Howell case through
taking action in that case which was detrimental to the [Brocks’] interest”;

 

(8) the Lawyers “fail[ed] to
represent [the Brocks’] interest with undivided loyalty”;

 

(9) the Lawyers “fail[ed] to
inform clients of all material facts as soon as conflicts arose”;

 

 

(10) the Lawyers “fail[ed] to
make full and fair disclosures of every facet of the proposed ‘Howell’
settlement and the settlement of the [Blockbuster] lawsuit”;

 

(11) the Lawyers “ha[d] the
[Brocks] sign a settlement document releasing another client in the same suit
(Renick) without advising them of the effect of such release and then attempted
to use such release in this suit to the detriment of [the Brocks] and to their
own benefit.”

 

 

 

 class=Section21>

Id. at
698.  The court concluded that “these allegations complain about the quality of
the Lawyers’ representation, specifically, the Lawyers’ failure to properly
advise, inform, and communicate with the Brocks, which are claims of
professional negligence.”  Id.  While it acknowledged that “paragraph
(4) states the Lawyers ‘engaged in self-dealing when they continued to
represent both Renick and the Brock[s],’” the court emphasized that “the Brocks
do not allege the Lawyers deceived them, pursued their own pecuniary interests
over the Brocks’ interests, or obtained any improper benefit from continuing to
represent both clients.”  Id. at 699.  The court similarly concluded
that paragraph (7), while stating “the Lawyers ‘chos[e] their own interest in
obtaining a multimillion dollar fee in the Howell case,’ to the detriment of
the Brocks,” related to paragraph (5) and “does not, without more, allege the
type of dishonesty or intentional deception that will support a
breach-of-fiduciary-duty claim.”  Id.

                        Although
Texas courts have struggled with the distinction in closer cases, see Murphy,
241 S.W.3d at 695, 696, we conclude without difficulty here that appellants’
“conflict-of-interest” complaint sounds in negligence only and not breach of
fiduciary duty.  As in Murphy, appellants “do not allege the [Terry
Defendants] deceived them, pursued their own pecuniary interests over
[appellants’] interests, or obtained any improper benefit” from failing to
disclose the “conflict” or advising appellants to obtain separate counsel.  Id.
at 698.  This is not a case like 

 class=Section22>

Deusch or
Floyd where the focus of the client’s complaint is that a lawyer or firm
pursued its own pecuniary interests at the client’s expense.  Instead, the
focus of appellants’ “conflict-of-interest” complaint is simply that the Terry
Defendants failed to advise Beck, the corporations’ sole shareholder, that the
interests of these entities diverged from his own personal interests and that
he should obtain separate counsel for the entities.  “[T]hese allegations
complain about the quality of the [Terry Defendants’] representation,
specifically, [their] failure to properly advise, inform, and communicate with
the [clients], which are claims of professional negligence.”  Id. 
Although appellants urge that the Terry Defendants, by their omissions, stood
to obtain attorney’s fees that a separate counsel otherwise would have
received, appellants make no allegations to that effect, and both the Murphy
and Floyd courts characterized such a complaint, standing alone, as a
negligence claim.  Murphy, 241 S.W.3d at 698; Floyd, 556 F. Supp.
2d at 662; see Duerr, 262 S.W.3d at 73-74. 

                        We
conclude that appellees met their burden of establishing that, as a matter of
law, appellants’ complaint that the Terry Defendants failed to disclose
“conflicts of interest” between Beck’s personal versus corporate interests or
advise him to retain separate counsel sound only in negligence.  Appellants do
not refer us to anything in their summary-judgment response that would present
a fact issue on that question.  Accordingly, the district court did not err in
granting summary judgment as to this theory of breach of fiduciary duty.[16]

 class=Section23>

            DTPA
violations

                        Appellants’
allegations of DTPA violations largely tracked their allegations of professional
negligence.  On appeal, appellants do not dispute that these allegations
“fractured” their professional negligence claim except to assert their
allegations that appellees “fail[ed] to disclose Terry’s alcohol and substance
abuse problems to Plaintiff” can support an independent DTPA claim.  See
Latham v. Castillo, 972 S.W.2d 66, 69 (Tex. 1998) (permitting independent
DTPA claim based on attorney’s affirmative misrepresentations that he had filed
lawsuit when, in fact, he had not).  We have previously explained that
appellants’ complaint about Terry’s undisclosed “alcohol and substance abuse
addictions” sounds in negligence rather than breach of fiduciary duty because
it goes to the Terry Defendants’ competence and, ultimately, the adequacy of
their legal services.  See Ersek, 69 S.W.3d at 270, 274-75 (DTPA
claim based on law firm’s “misrepresentations regarding its competency to
adequately represent Ersek in the underlying medical malpractice action” was an
improperly fractured negligence claim); Greathouse, 982 S.W.2d at 172
(complaint that lawyer misrepresented legal services would be of competent
quality when they were not constituted a negligence claim and not a DTPA
claim); see also Tex. Bus. & Com. Code Ann. § 17.49(c) (West Supp.
2008).  Consequently, summary judgment was appropriate on appellants’ DTPA
claim. 

 

            Breach
of contract 

                        On
appeal, appellants contend that the following allegation—which appears only in
Beck’s pleadings but not the corporations’—can support an independent
breach-of-contract claim: 

 

 

 class=Section24>

Defendants promised to finalize
the divorce decree only at such times as the Agreed Final Decree of Divorce has
been prepared and signed by both parties.  Defendants 

 class=Section25>

breached this promise and had
Plaintiff enter into a mediated settlement agreement on February 5, 2002, which
was a producing cause of Plaintiff’s damages as stated herein.

 

 class=Section26>

 

 

We need not
reach this issue because summary judgment can be affirmed on the alternative
ground that the contractual provision on which this cause of action is
predicated is unenforceable.  See State Farm Fire & Cas. Co., 858
S.W.2d at 380 (when trial court’s order granting summary judgment does not
specify the ground or grounds relied on for the ruling, summary judgment will
be affirmed on appeal if any of the theories advanced are meritorious).

                        Beck’s
breach-of-contract claim is based on the following provision of the Legal
Services Agreement, which is incorporated by reference into their petition:

 

Requirement of
Divorce Decree:  Except in exigent circumstances, as determined by agreement
between the attorneys and the Client, in cases involving the settlement of a
divorce suit, a final Decree of Divorce must be prepared and agreed upon by the
parties before the Divorce is rendered by the Court.  Rule 11 of the Texas
Rules of Civil Procedure and Texas law allows a matter in controversy to be
“settled” by a written agreement of the parties and for the trial court to
grant a divorce based solely upon the “Rule 11 Agreement,” and the Final Decree
of Divorce to be drafted, and signed by the parties and the judge at a later
date.  This procedure is also allowed in instances where a controversy is
settled through mediation, and a written mediation agreement is signed. 
However, a written order (Decree of Divorce) must be still prepared and
submitted to the Court for signature before the divorce judgment is final.  It
has been the repeated experience of this firm that obtaining a divorce based
only on the written agreement before the Decree of Divorce is prepared results
in an increased time delay, and an increased expense to the Client in having
all matters finalized.  This increased time and expense is incurred because
many of the detailed terms of the Decree of Divorce are not covered by the
written settlement agreement, and disputes usually arise regarding such items. 
Thus, this Firm has a strong policy of finalizing a divorce only at such
times as the Agreed Final Decree of Divorce has been prepared and signed by
both parties.  In the event that the case proceeds to trial and has not
been settled, then this section of the Legal Services Contract does not apply. 
Different treatment is afforded to cases that proceed to trial than those that
are settled, only because the powers of the Court to resolve disputes concerning
the terms of the Final Decree of Divorce are more expansive in cases where a
trial was held and the court was required to resolved the disputed issues.

 

 

(Emphasis
added).  Beck characterizes the italicized statement as a binding promise that
was breached when the Terry Defendants advised him to settle the divorce, and
participated in settling the divorce, before the final decree was prepared. 
Appellees respond that the provision, by its terms, merely describes a “policy”
and that a mere policy is not an enforceable promise.  See Loftis v. Town of
Highland Park, 893 S.W.2d 154, 155 (Tex. App.—Eastland 1995, no writ)
(policy in employee handbook not an enforceable promise).  Beck attempts to
distinguish Loftis, noting that the “strong policy” at issue here was
set out in a contract signed by both parties, rather than by something akin to
an employment handbook, as in Loftis.

                        We
apply well-established principles of construction in interpreting a written
contract.  The primary concern of the court is to ascertain the true intentions
of the parties as expressed in the instrument.  R & P Enters. v.
LaGuarta, Gavrel & Kirk, Inc., 596 S.W.2d 517, 518 (Tex. 1980); City
of Pinehurst v. Spooner Addition Water Co., 432 S.W.2d 515, 518 (Tex.
1968).  To achieve this objective, courts should examine and consider the
entire writing in an effort to harmonize and give effect to all the provisions
of the contract so that none will be rendered meaningless.  Universal C.I.T.
Credit Corp. v. Daniel, 243 S.W.2d 154, 158 (Tex. 1951).  No single
provision taken alone will be given controlling effect; rather, all the
provisions must be considered with reference to the whole instrument.  Myers
v. Gulf Coast Minerals Mgt. Corp., 361 S.W.2d 193, 196 (Tex. 1962); Citizens
Nat’l Bank in Abilene v. Texas & P. Ry. Co., 150 S.W.2d 1003, 1006
(Tex. 1941).

 

                        If
the written instrument is so worded that it can be given a certain or definite
legal meaning or interpretation, then it is not ambiguous and the court will
construe the contract as a matter of law.  Universal C.I.T. Credit Corp.,
243 S.W.2d at 157; R & P Enters., 596 S.W.2d at 519.  Whether a
contract is ambiguous is a question of law for the court to decide by looking
at the contract as a whole in light of the circumstances present when the
contract was entered.  Id. at 518.  In general, a contract is legally
binding only if the terms are sufficiently definite to allow a court to
understand the parties’ obligations.  Fort Worth Indep. Sch. Dist. v. City
of Fort Worth, 22 S.W.3d 831, 846 (Tex. 2000).  When an agreement leaves
material matters open for future adjustment and agreement, it is not binding
upon the parties and merely constitutes an agreement to agree.  Id.

                        The
provision at issue, by its plain terms, states a “policy” against finalizing a
divorce before agreeing on the terms of a final decree of divorce:  “this Firm
has a strong policy of finalizing a divorce only at such times as the Agreed
Final Decree of Divorce has been prepared and signed by both parties.”  Preceding
that statement is an explanation for the policy, as well as a provision
contemplating deviation from the policy.  Although deviation is permitted “in
exigent circumstances,” such circumstances are “as determined by agreement
between the attorneys and the Client.”  Construed as a whole, the provision at
issue merely states a general firm preference or practice not to settle divorce
cases until a final divorce decree can be agreed upon.  Furthermore, the
provision leaves the parties free to deviate from this policy by agreement (as
they did here).  This provision is too indefinite to be enforceable as a
binding contractual promise.  See id.; Valence Operating Co., 164
S.W.3d at 662 (contract terms are given their plain, ordinary, and generally
accepted meanings); see also Loftis, 893 S.W.2d at 156 (mere statement
of policy cannot support binding contract).  The district court did not err in
granting summary judgment on Beck’s breach-of-contract claim.

 

            Conclusion
regarding summary judgment

                        We
overrule appellants’ first issue and affirm the district court’s summary
judgment as to appellants’ claims for breach of fiduciary duty, DTPA
violations, and breach of contract.

 

Exclusion of
evidence

                        In
their second issue, appellants argue that the district court abused its
discretion at trial in excluding evidence of Terry’s purported “alcohol or
substance abuse” during the period in which he and his firm were representing
Beck.  Appellees objected to the admission of any such  evidence on the grounds
that its potential for unfair prejudice or confusion of the issues
substantially outweighed its probative value.  See Tex. R. Evid. 403. 
The district court agreed and excluded all such evidence.  Appellants urge this
was an abuse of discretion because this evidence was “highly probative,”
“essential,” and “a critical component” of their professional-negligence claims
because “the pervasive nature of the substance abuse affected [Terry’s]
judgment and representation of Mr. Beck in his divorce proceedings.” 
Alternatively, appellants contend that it was an abuse of discretion to wholly
exclude the evidence rather than addressing any potential unfair prejudice with
limiting instructions or by restricting the quantity of such evidence presented
to the jury.

 

                        Rulings
on the admission or exclusion of evidence are committed to the trial court’s
sound discretion.  City of Brownsville v. Alvarado, 897 S.W.2d 750, 753
(Tex. 1995).  A trial court abuses its discretion if it rules without regard
for any guiding rules or principles.  Id.  We uphold the district
court’s evidentiary ruling if there is any legitimate basis for the ruling.  Owens-Corning
Fiberglas Corp. v. Malone, 972 S.W.2d 35, 43 (Tex. 1998).  In other words,
a trial court does not abuse its discretion in admitting or excluding evidence
if it reaches the right result for the wrong reason.  Donalson v. Barr,
86 S.W.3d 718, 720 (Tex. App.—Houston [1st Dist.] 2002, no pet.); Luxenberg
v. Marshall, 835 S.W.2d 136, 141-42 (Tex. App.—Dallas 1992, no writ). 
Furthermore, for the exclusion of evidence to constitute reversible error, the
complaining party must show:  (1) that the trial court committed error; and (2)
that the error was reasonably calculated to cause and probably did cause
rendition of an improper judgment.  McCraw v. Maris, 828 S.W.2d 756, 757
(Tex. 1992).

                        In
urging the exclusion of appellants’ evidence of “alcohol or substance abuse”
under rule 403, appellees advocated two grounds.  First, appellees questioned
whether the evidence was even relevant to appellants’ professional negligence
claims because the ultimate issue was whether the Terry Defendants’ advice had
met the standard of care—an objective standard—not why their advice had
failed to meet it.  See Cosgrove, 774 S.W.2d at 665 (“The standard is an
objective exercise of professional judgment, not the subjective belief that his
acts are in good faith.”).  Second, appellees argued that appellants had not
presented evidence that any alcohol or substance abuse had actually impacted
the Terry Defendants’ representation.  We need only consider the second ground.


 

                        Appellants
made a bill of exceptions detailing the evidence they were prepared to offer
regarding Terry’s alcohol or drug use.  Outside the presence of the jury,
appellants elicited testimony from Kim Terry; Jim Mallios, who testified he was
a friend and former client of Terry; Vaught; and Hays.  Appellants also
included medical records from Sierra Tucson, the Arizona rehabilitation
facility where Terry was treated in September and October 2002.

                        Ms.
Terry claimed that in November 2001, Terry “was driving to go duck hunting and
was drinking in the car and drove his car into a ditch.”  She termed this event
“kind of a turning point” after which “[h]e was drinking a lot more, drinking
in the morning before he went to work drinking, coming home drunk.” 
Eventually, Ms. Terry testified that she organized an “intervention” in Terry’s
law office on September 13, 2002, in which six of Terry’s professional
colleagues, including Vaught and Hays, urged him to get help.  Following the
intervention, Terry went to Sierra Tucson for treatment.  Ms. Terry claimed
that by the time Terry went to Sierra Tucson, “it was becoming very clear” that
Terry was suffering from an alcohol and cocaine addiction that was impacting his
judgment and ability to function.  She added that “[w]ork wise, he just seemed
like he was in chaos drinking continuously and everything was getting more and
more disruptive at home.”

                        Mallios
testified that Terry had represented him in a divorce that was filed in 2001. 
He claimed that sometime between February 21 and April 18, 2002, Vaught called
him and advised that Terry “was not going to be able to finish up my divorce”
because he “was going to have to go to rehab because of cocaine addiction and possible
alcoholism.”  Mallios—who admitted to a prior probated suspension from the
State Bar “because of my own use of cocaine and alcohol”—also opined that,
based on his own experience, cocaine or alcohol addiction “[a]dversely affects
the ability of the lawyer to represent a client,” in particular, “in the area
of judgment.  You might decide to do some things that were inappropriate or too
. . . expensive.”  Mallios cited two examples of Terry’s “impaired judgment”
from his divorce—Terry’s request for a cash retainer and an unsuccessful
attempt to circumvent a district court ruling by going to probate court.  He
added that he perceived Terry’s problems to be widely known in the legal
community.

                        Vaught
testified that he first learned of any issue with Terry and alcohol or drugs on
September 13, 2002, when Ms. Terry interrupted a meeting he was conducting at
the office with Hays and paralegals and asked him and Hays to participate in an
“intervention.”  He termed Mallios’s account of their phone conversation as
“absolutely false” and disputed Mallios’s perception that it was commonly known
Terry had alcohol or drug problems.  Vaught added that Terry was gone for about
four weeks after the intervention, but that he had no knowledge whether Terry
had completed the rehabilitation program.  Similar to Vaught, Hays testified
that he first learned about any problems with Terry when he was asked to
participate in the intervention, adding that “[i]t was explained to me that it
was for—Ted was drinking.”  Hays, like Vaught, recounted that he had not known
whether Terry completed the rehabilitation program.

                        The
Sierra Tucson records reflect that Terry was treated at the facility between
September 13 and October 4, 2002, when he left against medical advice.  They
further indicated that Terry and Ms. Terry had been experiencing marital
problems, that the couple had been intermittently separated for about two
months prior to the intervention, and that Terry had perceived Ms. Terry’s
orchestration of the intervention as posturing for an anticipated divorce
proceeding.  However, the records also reflected clinical findings of alcohol
dependency and depression, and that Terry had planned to come to the facility
on his own volition later that year to treat his alcohol problem.  According to
the records, Terry reported daily consumption of three to six beers but denied
ever going to court while intoxicated.  We cannot discern any clinical findings
related to drug use from these records.  The records also reflect that Terry
complained of “some difficulty concentrating with poor decision-making” and “a
history of short-term memory loss.”  Appellants portray these statements as
indications that Terry’s judgment or performance as a lawyer had been impaired
by alcohol.  However, the records indicate that the staff associated these
symptoms with depression rather than alcohol use.

                        At
trial, appellants attempted to lay a predicate for the excluded evidence with
the following testimony from Beck about Terry’s behavior during the February 4,
2002 mediation:

 

 

 class=Section27>

Q.
       Did the actions and conduct of Mr. Ted Terry concern you during the
mediation?

 

A.        Oh, very definitely
during the mediation, yes, sir.

 

Q.        Describe
the observable physical actions of Mr. Terry that caused you concern and
concern about your case.

 

A.        We
were sitting at the—in the mediation room and Mr. Terry—I kept thinking he was
nervous and he was physically—his hands were like this (indicating).[[17]]

 

Q.        Is
this all you noticed?

 

A.        No.
And that is what I alluded to earlier about what my legal advice—Mr. Herman
asked me what legal advice did I base my complaint on.  And that was that.  The
only thing that mattered was the size of the owelty note, that it didn’t matter
what stuff went into the pie because the owelty note was going to be the size
of that thing was all that mattered.  And that’s what he was telling me.  And
he did it because he just kept sitting in his chair with his eyes closed.  And
he would lean back and forth like this (indicating) and say only the size that
matters is the size of the owelty note.  He just—he did that literally for like
an hour.  And I thought at the time that that’s really strange.  And I had been
around Ted before and had not necessarily observed him doing that.

 

 

 

 class=Section28>

                        Appellants
urge that the excluded evidence was highly probative of Terry’s “pervasive” use
or dependency on alcohol or drugs and that, together with Beck’s testimony, of
Terry’s impaired judgment and performance during the representation.  We cannot
conclude that the district court abused its discretion in excluding the
evidence under rule 403.  As previously explained, the pivotal events in Beck’s
divorce proceeding were the February 4, 2002 mediation and, on the following
day, the execution of the irrevocable Mediated Settlement Agreement and
rendering of the divorce judgment based on that agreement.  At trial,
appellants sought only damages for “the amount, if any, that the Beck Benefits
Company paid to Ruth Ann Beck pursuant to the mediated settlement agreement
that it would not have paid but for the negligence you found in answer to [the
negligence question].”  The Sierra Tucson records reflected Terry’s condition
some seven months after the settlement.

                        Appellants
were prepared to present evidence that, in general, Terry had increased his use
of alcohol between November 2001 and the September 2002 intervention, and Ms.
Terry and Mallios did accuse the late Terry of using cocaine during this
period.  Mallios, in particular, gave disputed testimony that he was informed
sometime after the mediation and settlement—between February 21 and April 18,
2002—that Terry had a cocaine addiction.  However, appellants come no closer to
establishing any relationship between Terry’s alleged drinking or drug use and
his performance when representing Beck than Beck’s testimony about what he
termed Terry’s “strange” behavior during the mediation.  Without more, the
evidence falls short of supporting an inference that Terry’s performance when
negotiating the Mediated Settlement Agreement was actually impaired by alcohol
or drugs.  Similarly, even crediting Mallios’s opinions that alcohol and drug
addiction can adversely impact a lawyer’s judgment, there is nothing linking
this general observation to Terry’s performance during the settlement
negotiations.  At a minimum, we conclude that any probative value of the
excluded evidence was so greatly outweighed by the danger of unfair prejudice
and confusion of the issues that the district court properly excluded it under
rule 403.  See Dudley v. Humana Hosp. Corp., 817 S.W.2d 124, 126-27
(Tex. App.—Houston [14th Dist.] 1991, no writ); Hutton v. Payne, No.
07-00-00468-CV, 2002 Tex. App. LEXIS 3376, at *5-6 (Tex. App.—Amarillo 2002, no
pet.).  We overrule appellants’ second issue.

 

Motion for
new trial   

                        In
their third issue, appellants argue that the district court abused its
discretion in denying their motion for new trial.  Appellants urge that the
district court should have vacated the summary-judgment ruling in light of the
evidence of Terry’s alcohol use—particularly the Sierra Tucson records—that
appellants obtained in subsequent discovery.  Appellants complain that
appellees unfairly benefitted from “obstructionist discovery conduct” that
deprived appellants of the Sierra Tucson records until shortly before trial,
when it was too late to use this evidence in opposition to the summary
judgment.  Relatedly, appellants suggest that the district court’s
summary-judgment and evidentiary rulings, which were made by different judges,
were inconsistent and that the trial judge, who also decided the new trial
motion, recognized this yet arbitrarily declined to disturb his colleague’s
prior summary-judgment ruling.[18] 
Appellants emphasize the following comments by the trial judge when excluding
Kim Terry’s testimony:  “I want to say that I could see it going to the
fiduciary duty claim.  And that has—is no longer in the case.  And obviously,
if that’s reversed on appeal, then somebody would have to take up the question
of admissibility of the evidence on that claim.”

                        We
review a trial court’s denial of a motion for new trial for abuse of
discretion.  In the Interest of R.R., 209 S.W.3d 112, 114
(Tex. 2006); Director, State Employees Workers’ Comp. Div. v. Evans, 889
S.W.2d 266, 268 (Tex. 1994).  The trial court abuses its discretion if it acts
without reference to any guiding principles or acts arbitrarily or
unreasonably.  Downer v. Aquamarine Operators, Inc., 701 S.W.2d 238,
241-42 (Tex. 1985).  Although we are generally deferential to the trial court’s
determination of facts, see, e.g., Flores v. Fourth Court of Appeals,
777 S.W.2d 38, 41-42 (Tex. 1989), we do not defer to a trial court’s
application of the law, McDaniel v. Yarbrough, 898 S.W.2d 251, 253 (Tex.
1995).  A failure by a trial court to analyze or apply the law correctly is an
abuse of discretion.  Id.

                        We
conclude that the district court did not abuse its discretion in overruling
appellants’ motion for new trial.  When analyzing appellants’ first issue
challenging the summary-judgment ruling, we took as true appellants’ pleading
allegations that Terry had “alcohol and substance abuse addictions,” that the
Terry Defendants were aware of that condition and never disclosed it to Beck,
and that Beck would not have hired the Terry Defendants if he had known of the
condition.  We concluded that appellants’ complaint with the Terry Defendants’
failure to disclose that condition sounded only in negligence because it
implicated the Terry Defendants’ competence and the adequacy of their
representation.  See Ersek, 69 S.W.3d at 270, 274-75; Kahlig, 980
S.W.2d at 689-91; Greathouse, 982 S.W.2d at 172.  As with the evidence
appellants presented with their summary-judgment response, the Sierra Tucson
records and other additional evidence add nothing to the legal analysis of
whether appellants’ complaint regarding Terry’s undisclosed “alcohol and
substance abuse addictions” are classified as negligence claims or
breach-of-fiduciary-duty claims.  We also note that the trial judge explained
its similar analysis of this issue during the new trial hearing.  Appellants’
attempt to portray the judge as blindly adhering to the summary-judgment ruling
does not accurately depict the record as a whole.

                        Beyond
this, appellants urged during oral argument that the district court’s summary
judgment and evidentiary rulings, in combination, stand for the troubling
proposition that Texas clients have no remedy for injury caused by their
drunken or drugged lawyers.  This, of course, is not the import of our
holdings.  As appellees acknowledged during oral argument, there may be
circumstances in which evidence of a lawyer’s impairment by drugs and alcohol
is integral to proof of whether the lawyer’s representation fell below the
standard of care.  However, as we have explained, this is not such a case.  We
also note that the regulatory regime that governs the conduct of Texas lawyers
is not limited to tort duties applied in the courts, but also includes the
Disciplinary Rules of Professional Responsibility that are enforced by the
State Bar.

 

 

                        We
overrule appellants’ third issue.

 

CONCLUSION

                        Having
overruled each of appellants’ issues, we affirm the judgment of the district
court.

 

                        

                        

                                                                        __________________________________________

Bob Pemberton, Justice

Before Justices Patterson,
Pemberton and Waldrop;

     Concurring Opinion by
Justice Patterson

 

Affirmed

 

Filed:   May 1, 2009









[1] 
Additionally, Vaught and Hays were each board-certified in civil appellate law,
and Hays was board-certified in civil trial law.





[2] 
As Beck put it, “I think that agreement effectively moots all of those claims.”






[3] 
Among Beck’s concerns was that at least one of the corporations would be
rendered insolvent by the additional lien because the amount of the
indebtedness secured by the lien would exceed the value of the corporation’s
assets, and that the encumbrance would prevent him from selling the properties
or obtaining financing.  Another issue related to the tax implications of
“awarding” him the corporate assets.  That issue was ultimately settled by the
parties.

 

                 Beck also
claimed that while he had initially succeeded in obtaining consent to the
second liens from the superior lienholders, the superior lienholders had
subsequently “change[d] their mind” and revoked that consent, presenting the
risk that the attachment of the additional lien would constitute an event of
default.  Hays advocated this position on Beck’s behalf at several hearings
over the ensuing months and, based on that understanding, filed an appeal from
the divorce decree.  Hays thereafter determined that Beck’s assertions about
the superior lienholders’ revocations of consent had been false.  Hays obtained
Beck’s permission to advise the district court of the inaccurate information,
and did so on June 12.  Tex. Disc. R. Prof. Resp. 3.03.  Beck thereafter
dismissed his appeal.





[4] 
Hays testified that the firm credited Beck’s bill for the sanctions amount.





[5] 
Hays testified that the district court accepted some of the Terry Defendants’s
proposed changes and rejected others.





[6] 
See Tex. Bus. & Com. Code Ann. §§ 17.46, .50 (West Supp. 2008).





[7] 
In fact, during his deposition, Beck acknowledged that his decision to sue
Terry was “solidified” when he heard at a family law practitioners’ event that
Terry “had an impairment issue.”  





[8] 
Prior to trial, Terry died.  His estate, through its representative, John Ott,
was substituted as a party.  See Tex. R. Civ. P. 152.





[9] 
As the supreme court described the standard:

 

If an attorney
makes a decision which a reasonably prudent attorney could make in the same or
similar circumstance, it is not an act of negligence even if the result is
undesirable.  Attorneys cannot be held strictly liable for all of their
clients’ unfulfilled expectations.  An attorney who makes a reasonable decision
in the handling of a case may not be held liable if the decision later proves
to be imperfect.  The standard is an objective exercise of professional
judgment, not the subjective belief that his acts are in good faith.

 

Cosgrove v. Grimes, 774
S.W.2d 662, 665 (Tex. 1989).





[10] 
Courts frequently use “legal malpractice” and “professional negligence”
interchangeably to refer to claims arising from an attorney’s allegedly
inadequate legal representation, although “professional negligence” might be a
more precise term.  Compare Duerr v. Brown, 262 S.W.3d 63, 69-70
(Tex. App.—Houston [14th Dist.] 2008, no pet.) (using “legal malpractice
claims” to refer to professional negligence claims when addressing fracturing
issues), with Deutsch v. Hoover, Bax & Slovacek, L.L.P., 97
S.W.3d 179, 184 n.1 (Tex. App.—Houston [14th Dist.] 2002, no pet.) (noting “a
potential nomenclature problem” with using “legal malpractice” to describe
professional negligence claims because term could also be understood to
encompass any claim brought by a client against that client’s attorney, and
opting to use “negligence claim” to “avoid confusion”).  We will generally use
“professional negligence”to describe such claims, although we will also quote
several opinions that use “legal malpractice” to refer to negligence claims
against lawyers.





[11] 
Emphasizing appellees’ reliance on their pleadings, appellants urge that the
summary-judgment motion is an attack on a “pleading defect” and is permitted
only through special exceptions with an opportunity to amend.  See Massey v.
Armco Steel Co., 652 S.W.2d 932, 934 (Tex. 1983); Texas Dep’t of
Corrections v. Herring, 513 S.W.2d 6, 10 (Tex. 1974).  We disagree. 
Appellees challenge not a “pleading defect” in the sense of this rule, but
whether, as a matter of law, the facts that are the basis for appellants’
asserted causes of action implicate only the Terry Defendants’ duties of
ordinary care or independent fiduciary, statutory, or contractual duties. 
Appellants’ petition is significant to this inquiry because the factual
allegations it contains are in the nature of admissions relevant to that issue,
not because there is any defect in how appellants have pled any of their causes
of action.  Consistent with these observations, Texas courts routinely look to
the factual allegations in the plaintiff’s petition when addressing fracturing
issues not only in the summary-judgment context, see Duerr, 262
S.W.3d at 71; Murphy, 241 S.W.3d at 697-98, but also when such issues
are raised at trial or post-trial.  See Deutsch, 97 S.W.3d at 187-91
(directed verdict); Kahlig v. Boyd, 980 S.W.2d 685, 688-89 (Tex.
App.—San Antonio 1998, pet. denied) (j.n.o.v); Goffney v. Rabson, 56
S.W.3d 186, 189-90 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) (motion
for new trial).  





[12] 
Following the “facts of claims against Terry Defendants,” the second amended
petition was organized into separate sections containing pleadings of Beck’s
causes of action and damages, followed by the corporations’ pleadings of their
causes of actions and damages.  These sets of pleadings were parallel and
largely identical, differing chiefly in using the singular versus plural forms
of verbs.





[13] 
In reaching this conclusion, as well as our similar conclusion regarding
appellants’ “conflict-of-interest” theory, discussed below, we have considered
the remedies appellants sought.  See Murphy, 241 S.W.3d at 698. 
Appellants pled for the following “actual damages” incurred “[a]s a result of
the Terry Defendants’ negligence, and other bases of liability”:

 

 

a.         An adverse judgment and payment of attorney’s fees for
services not rendered or rendered inadequately;

 

b.         Losses incurred due to encumbering corporate stock and
properties as security for indebtedness to Ruth Ann Beck;

 

c.         Losses incurred by Plaintiff due to payments made to Ruth
Ann Beck by the Plaintiff companies;

 

d.         Losses incurred as a result of the Owelty note signed by
Plaintiffs;

 

e.         Interest paid on the Owelty note;

 

f.          Attorney’s fees paid to Defendants;

 

g.         Loss of income due to encumbrance of additional liens on
real estate; and

 

h.         Losses incurred as a result of the inability to further
develop properties.

 

The corporations, although not
Beck, also sought “i.  Loss of corporate assets as a result of payments secured
by corporate stock.”  All appellants further sought exemplary damages, treble
damages under the DTPA, attorney’s fees under the DTPA and section 38.001 of
the civil practice and remedies code, and interest.

 

            Although these
remedies consisted primarily of actual damages arising from the terms of the
Mediated Settlement Agreement and divorce decree, appellants characterize their
request for “[a]ttorney’s fees paid to Defendants” as a claim for equitable fee
forfeiture.  While appellees dispute this characterization on appeal, they successfully
advanced the position before the district court that this pleading sought
equitable fee forfeiture.  After obtaining the summary judgment at issue on
appeal, appellees filed a second summary-judgment motion seeking to limit the
negligence damages appellants could recover.  Appellees asserted the ground
that appellants could not recover their attorney’s fees as negligence damages
because “Plaintiffs’ claim for breach of fiduciary duty was dismissed on
summary judgment” and “[f]ee forfeiture, as a matter of law, is not an element
of damages under Beck’s negligence claims.”  The district court granted summary
judgment on that ground.  It acknowledged the prior summary-judgment order
“finding there was no breach of fiduciary duty,” and held, “Because a breach of
fiduciary duty is a necessary element of Plaintiffs’ claims for disgorgement,
summary judgment is proper.”

 

            That a plaintiff
sought equitable fee forfeiture—a remedy characteristic of a
breach-of-fiduciary-duty claim—is a factor courts can consider when classifying
a complaint as either a negligence or breach-of-fiduciary-duty claim.  See
id.  However, while the remedy may inform our analysis, it is not
necessarily dispositive.  Duerr, 262 S.W.3d at 74; Murphy,
241 S.W.3d at 698.  Even assuming that appellees are bound to their prior
position that appellants sought equitable fee forfeiture, the mere fact
appellants requested that remedy does not alter our conclusion that appellants’
complaints implicate only the Terry Defendants’ duty of ordinary care and not
any independently actionable fiduciary duty, for the reasons we have explained
above. 





[14] 
Ms. Terry, who was also an employee of Terry’s firm, testified that Terry would
drink and become drunk at the office, and had wrecked his car while driving
drunk in November 2001.  She also claimed to have seen signs of controlled
substance use in his office at home.  Ms. Terry further testified that she had
organized an “intervention” in September 2002 by friends and colleagues of
Terry, including Hays.  Shortly after the intervention, according to Ms. Terry,
Terry checked into the Arizona rehabilitation center, Sierra Tucson, but
ultimately returned home without completing the treatment program.  Ms. Terry
claimed that Terry’s problems were “a slow progression” that reached “the
really severe state” during “[p]robably the ten months before he went off to
rehab,” and that he was “really kind of spiraling out of control” between his
November 2001 car wreck and the September 2002 intervention.  As noted, Beck
hired the Terry Defendants in the fall of 2001, and the divorce was mediated
and settled in February 2002.





[15] 
Appellees also urge us to affirm the summary judgment because “Plaintiffs could
not establish the necessary causal connection between the alleged substance
abuse and any wrongdoing by Defendants.”  They further assert we should affirm
based on an implied finding that non-disclosure of the substance-abuse was not
a “clear and serious” breach of fiduciary duty.  See Burrow v. Arce,
997 S.W.2d 229, 246 (Tex. 1998).  However, the Terry Defendants did not raise
either ground in their summary-judgment motion; consequently, we cannot affirm
on those bases. McConnell v. Southside Indep. Sch. Dist., 858 S.W.2d
337, 340-41 (Tex. 1993); see Deutsch, 97 S.W.3d at 190-92
(distinguishing between directed verdict based on non-fracturing rule versus no
evidence that the attorney-client fiduciary duty was breached); id. at
204-05 (Brister, C.J., concurring and dissenting) (while urging that directed
verdict could be affirmed based on implied finding of no clear and serious
breach of fiduciary duty regardless whether the ground had been presented in
the directed-verdict motion, observing that “[a] directed verdict is not like a
summary judgment”).





[16] 
In their reply brief on appeal, appellants, for the first time, argue that they
have alleged an independent breach of fiduciary duty based on the Terry
Defendants’ “failing to make a full and fair disclosure of every facet of a
proposed divorce settlement” and that the settlement “would improperly impair
the Beck Corporate Plaintiffs’ assets, as well as Mr. Beck’s ability to operate
his corporate businesses.”  It is unclear whether appellants view this theory
as distinct from their “conflict-of-interest” theory and, if so, whether they
have preserved this argument.  In any event, this theory sounds only in
negligence, as it goes to the adequacy of the Terry Defendants’ legal advice
regarding the possible impact of the Mediated Settlement Agreement.  See
Murphy, 241 S.W.3d 698 (holding that a similar complaint sounded in
negligence).





[17] 
The record does not reflect the nature of the behavior Beck was demonstrating.





[18] 
The Honorable Suzanne Covington granted the summary judgment that is the
subject of this appeal, while the Honorable Stephen Yelenosky presided at trial
and post-trial.